**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE:

DELPHI CORPORATION, *et al.*,

Debtors.

08 Civ. ________

Bankr. Case No. 05-44481 (RDD)
(Jointly Administered)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DELPHI CORPORATION, DELPHI AUTOMOTIVE SYSTEMS LLC, and DELPHI AUTOMOTIVE SYSTEMS SERVICES LLC,

Plaintiffs,

- against -

THE UNITED STATES OF AMERICA,

Defendant.

Adversary Proceeding
No. 08-01038

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S MOTION FOR AN ORDER WITHDRAWING THE REFERENCE**

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-1945
Facsimile: (212) 637-2750
E-mail: matthew.schwartz@usdoj.gov

MATTHEW L. SCHWARTZ
JOSEPH N. CORDARO
Assistant United States Attorneys
- Of Counsel -

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT. . . . . 1

BACKGROUND. . . . . 3

A. Delphi's Bankruptcy. . . . . 3

B. This Adversary Proceeding. . . . . 5

ARGUMENT. . . . . 8

THIS ADVERSARY PROCEEDING SHOULD BE LITIGATED IN DISTRICT COURT. . . . . 8

A. Withdrawal of the Reference, Generally. . . . . 8

B. This Adversary Proceeding Is Subject to Mandatory Withdrawal of the Reference Because It Implicates Substantial Questions of Federal Tax Law. . . . . 9

1. Withdrawal of the Reference Is Mandatory Whenever a Proceeding Involves "Significant Interpretation" of Non-Bankruptcy Federal Law. . . . . 10

2. Resolution of this Case Will Require the Court to Determine Whether Delphi's 1999 and 2003 Payments Were "Wages," Which Requires Substantial Interpretation of the Tax Laws.. . . . . 13

a. The Law of Federal Insurance Contribution Act Taxes.. . . . . 14

i. Revenue Ruling 58-145. . . . . 15

ii. Revenue Ruling 2004-109. . . . . 16

b. CBA Ratification Payments Are "Wages". . . . . 19

3. Resolution of this Case Will Also Require This Court to Consider What Level of Deference Revenue Rulings Are Due.. . . . . 21

4. Resolution of this Case Will Require This Court to Determine When, and Under What Circumstances, Revenue Rulings May Be Applied Retroactively. . . . . . . . . . . . 25

C. This Court Should Withdraw the Reference as a Matter of Discretion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

1. This Adversary Proceeding Is a Non-Core Proceeding. . . . . . . 30

2. Withdrawal of the Reference Is in the Interests of Judicial Economy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

3. Withdrawal of the Reference Will Save the Parties From Cost and Delay. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

4. Withdrawal Will Not Affect Administration of the Bankruptcy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

5. Forum Shopping Is Not an Issue Here.. . . . . . . . . . . . . . . . . . . 34

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Abrahamsen v. United States*,
228 F.3d 1360 (Fed. Cir. 2000).. . . . . . . . . . . . 20

*Aeroquip-Vickers, Inc. v. Commissioner of Internal Revenue*,
347 F.3d. 173 (6th Cir. 2003). . . . . . . . . . . . . 23, 25

*American Telephone & Telegraph Co. v. Chateaugay Corp.*,
88 B.R. 581 (S.D.N.Y. 1988).. . . . . . . . . . . . . 11

*Atlantic Mutual Insurance Co. v. Commissioner of Internal Revenue*,
523 U.S. 382 (1998). . . . . . . . . . . . . 22

*Auer v. Robbins*,
519 U.S. 452 (1997). . . . . . . . . . . . . 23

*Automobile Club of Michigan v. Commissioner of Internal Revenue*,
353 U.S. 180 (1957). . . . . . . . . . . . . 27

*Barnhart v. Walton*,
535 U.S. 212 (2002). . . . . . . . . . . . . 24

*Bob Jones University v. United States*,
461 U.S. 574 (1983). . . . . . . . . . . . . 22

*Century Hotels v. United States*,
952 F.2d 107 (5th Cir. 1992). . . . . . . . . . . . . 12

*Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984). . . . . . . . . . . . . 22

*Chock Full O' Nuts Corp. v. United States*,
453 F.2d 300 (2d Cir. 1971). . . . . . . . . . . . . 27

*Christensen v. Harris County*,
529 U.S. 576 (2000). . . . . . . . . . . . . 25

*City of New York v. Exxon Corp.*,
932 F.2d 1020 (2d Cir. 1991). . . . . . . . . . . . . 10, 11

*Dominion Resources, Inc. v. United States*,
219 F.3d 359 (4th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Donnell v. United States*,
50 Fed. Cl. 375 (2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Dunmore v. United States*,
358 F.3d 1107 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Eastern Airlines, Inc. v. Air Line Pilots Association (In re Ionosphere Clubs, Inc.)*,
No. 89 Civ. 8250 (MBM), 1990 WL 5203 (S.D.N.Y. Jan. 24, 1990). . . . . . . . 10

*Environmental Defense v. Duke Energy Corp.*,
— U.S. —, 127 S.Ct. 1423 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Enron Corp. v. J.P. Morgan Securities, Inc. (In re Enron Corp.)*,
Nos. 07 Civ. 10527 (SAS), 07 Civ. 10530 (SAS),
2008 WL 649770 (S.D.N.Y. Mar. 10, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Fallu Productions., Inc. v. United States*,
No. 06 Civ. 13248 (DLC), 2008 WL 397912 (S.D.N.Y. Feb. 13, 2008) . . . . . 22

*Flora v. United States*,
357 U.S. 63 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Fortis, Inc. v. United States*,
420 F. Supp. 2d 166 (S.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Gerbec v. United States*,
164 F.3d 1015 (6th Cir.1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Gillespie v. United States*,
23 F.3d 36 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Gordon Sel-Way, Inc. v. United States (In re Gordon Sel-Way, Inc.)*,
270 F.3d 280 (6th Cir.2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Greenwald v. United States*,
No. 98 Civ. 3439 (DC), 2000 WL 16939 (S.D.N.Y. Jan. 10, 2000). . . . . . . . . 21

*Halper v. Halper*,
164 F.3d 830 (3d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re CM Holdings, Inc.*,
221 B.R. 715 (D. Del. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*In re G-I Holdings*,
295 B.R. 222 (D.N.J. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Oil Company*,
140 B.R. 30 (E.D.N.Y. 1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Pan Am Corp.*,
133 B.R. 700 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Parmalat Finanziaria S.p.A.*,
320 B.R. 46 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re S.G. Phillips Constructors, Inc.*,
45 F.3d 702 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Texaco Inc.*,
84 B.R. 911 (S.D.N.Y. 1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re WorldCom, Inc.*,
371 B.R. 19 (Bankr. S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Keene Corp. v. Williams Bailey & Wesner, LLP (In re Keene Corp.)*,
182 B.R. 379 (S.D.N.Y. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Kohn v. Haymount Ltd. Partnership (In re International Benefits Group, Inc.)*,
Civil Action No. 06-2363 (KSH), 2006 WL 2417297
(D.N.J. Aug. 21, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*LTV Steel Co. v. City of Buffalo (In re Chateaugay Corp.)*,
No. 00 Civ. 9429 (SHS), 2002 WL 484950 (S.D.N.Y. Mar. 29, 2002). . . . . . . 30

*Magnone v. United States*,
902 F.2d 192 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Mayberry v. United States*,
151 F.3d 855 (8th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*McCrory Corp. v. 99¢ Only Stores (In re McCrory Corp.)*,
160 B.R. 502 (S.D.N.Y. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Mishkin v. Ageloff*,
220 B.R. 784 (S.D.N.Y. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*North Dakota State University. v. United States*,
255 F.3d 599 (8th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*,
458 U.S. 50 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Orion Pictures Corporation. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095 (2d Cir. 1993). . . . . . . . . . . 29, 30, 31

*Pan Am Corp. v. Delta Air Lines, Inc. (In re Pan Am Corp.)*,
163 B.R. 41 (S.D.N.Y. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Riemels v. Commissioner of Internal Revenue*,
436 F.3d 344 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Rowan Companies v. United States*,
452 U.S. 247 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Security Farms v. International Brotherhood of Teamsters*,
124 F.3d 999 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Shugrue v. Air Line Pilots Association. (In re Ionosphere Clubs, Inc.)*,
922 F.2d 984 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Social Security Board v. Nierotko*,
327 U.S. 358 (1946). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*South Street Seaport Ltd. Partnership v. Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94 F.3d 755 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . 29

*Texasgulf, Inc. v. Commissioner of Internal Revenue*,
172 F.3d 209 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States Gypsum Co. v. National Gypsum Co. (In re National Gypsum Co.)*, 145 B.R. 539 (N.D. Tex. 1992). . . . . . . . . . . . . 10

*United States v. Cleveland Indians Baseball Co.*,
532 U.S. 200 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

*United States v. Clintwood Elkhorn Mining Co.*,
— U.S. —, 128 S.Ct. 1511 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Correll*,
389 U.S. 299 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Forma*,
42 F.3d 759 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Mead Corp.*,
533 U.S. 218 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23, 24

*University of Pittsburgh v. United States*,
507 F.3d 165 (3d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Vons Companies v. United States*,
51 Fed. Cl. 1, 20-24 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Weisbart v. United States Department of Treasury*,
222 F.3d 93 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**STATUTES**

Bankruptcy Amendments and Federal Judgeship Act of 1984,
Pub. L. No. 98-353, 98 Stat. 333 (1984).. . . . . . . . . . . . . . . . . . . . . . . . . . 8

Bankruptcy Code, 11 U.S.C. §§ 101-1330. . . . . . . . . . . . . . . . . . . . . . . . . . . 6

11 U.S.C. § 502(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

11 U.S.C. § 505(a)(1).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 U.S.C. § 157. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 1334(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. § 1346(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 31

Federal Insurance Contribution Act, 26 U.S.C. §§ 3101-3128. . . . . . . . . . . . . . . . 14

I.R.C. § 3101. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.R.C. § 3111. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.R.C. § 3112. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.R.C. § 3121. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.R.C. § 3121(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

I.R.C. § 3121(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

I.R.C.§ 3306. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.R.C. § 3401(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

I.R.C. § 6511. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.R.C. § 6532(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.R.C. § 6662. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

I.R.C. § 7805(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

I.R.C. § 7805(b)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**REGULATIONS**

26 C.F.R. § 1.6662-3(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

26 C.F.R. § 31.3121(a)-1(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

26 C.F.R. § 31.3121(a)-1(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 32

26 C.F.R. § 31.3121(b)-3(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

26 C.F.R. § 31.3306(b)-1(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

26 C.F.R. § 31.3306(c)-2(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

26 C.F.R. § 31.3401(a)-1(a)(1).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

26 C.F.R. § 31.3401(a)-1(a)(2).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

26 C.F.R. § 601.601(d)(2)(i)(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

26 C.F.R. § 601.601(d)(2)(v)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

26 C.F.R. § 601.601(d)(2)(v)(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

26 C.F.R. § 601.601(d)(2)(v)(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 5011(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Rev. Rul. 58-145, *available at* 1958 WL 10767. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Rev. Rul. 69-424, *available at* 1969 WL 18685. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Rev. Rul. 71-532, *available at* 1971 WL 26820. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Rev. Rul. 74-108, *available at* 1974 WL 34853. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Rev. Rul. 2004-109, *available at* 2004 WL 2659666. . . . . . . . . . . . . . . . . . . . . . *passim*

Rev. Rul. 2004-110, *available at* 2004 WL 2659667.. . . . . . . . . . . . . . . . . . . . . . . . 18

S. Rep. No. 98-23 (1983), *as reprinted in* 1983 U.S.C.C.A.N. 143.. . . . . . . . . . . . . . . 28

Treas. Order 111-2, *available at* 1981 WL 127095. . . . . . . . . . . . . . . . . . . . . . . . . . 24

Department of the Treasury News Release, *Treasury and IRS Clarify Employment Tax Treatment of Payments Made on the Signing or Cancellation of an Employment Contract*, at 2004 WL 2669356 (Nov. 23, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

T. Keith Fogg, Grover Hartt, III & Mark S. Wallace, *When, Why, and How Should a District Court Be Asked to Withdraw the Reference of a Tax Controversy to a Bankruptcy Court?,* 20 Prac. Tax. Law. 41 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Mary B. Hevener & Anne G. Batter, *When Are Payments From an Employer to an Employee Not "Wages" Subject to Employment Taxes?*, 95 J. Tax'n 349 (2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Defendant the United States of America, by and through its attorney Michael J. Garcia, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its motion for withdrawal of the reference to the United States Bankruptcy Court for the Southern District of New York of this adversary proceeding, pursuant to 28 U.S.C. § 157(d).

**PRELIMINARY STATEMENT**

In this adversary proceeding, Delphi Corporation and two of its affiliated debtors are suing the United States for a refund of approximately $26 million in federal employment taxes. According to Delphi, it paid these taxes in connection with lump-sum bonuses to its union-affiliated employees after they ratified a new collective bargaining agreement. Delphi contends that these CBA ratification payments were not "wages" under the Internal Revenue Code, and so it did not owe employment taxes on them.

At the heart of Delphi's case is its contention that the IRS's formal interpretation of the term "wages" (in a 2004 Revenue Ruling) "is contrary to both the [Internal Revenue Code] and Treasury regulations," and constitutes a "revocation" of other guidance that had been in force since the 1950s. The resolution of that claim — a purely legal one — will require the court that decides this case to examine difficult questions of tax law, but not to wrestle with the Bankruptcy Code at all. Beyond interpreting the meaning of the term "wages," for example, the court will likely have to consider what level of deference should be afforded an IRS Revenue Ruling in light of recent Supreme Court precedent. The court may also have to consider when a Revenue Ruling can permissibly be applied

retroactively, as was done here. And the court hearing this case will also have to consider factually significant questions, like whether these payments were made in consideration for services, or whether they were really ratification bonuses that were not contingent on services at all, as Delphi contends.

*All* of these are substantial questions that implicate pure tax and administrative law; they have virtually nothing to do with either the administration of this bankruptcy or with the bankruptcy laws generally. And the questions at the center of this case — the validity of the IRS's 2004 Revenue Ruling and whether payments to union members for ratifying a collective bargaining agreement constitute taxable wages — are ones of first impression. They are also questions of national importance that the automotive industry is litigating nation-wide: Ford, General Motors, and Saturn have all filed similar refund cases elsewhere.

Put simply, this case belongs in district court. Withdrawal of the reference is mandatory when resolution of the proceeding requires the court to decide substantial questions of non-bankruptcy law. Delphi's complaint makes clear that this is such a case. And even when not mandatory, withdrawal is permitted upon a showing of cause that turns mostly on considerations of judicial economy. The resolution of this case does not impact the administration of Delphi's estate, and it will end up in district court anyway — because this case is not a "core proceeding" within the meaning of the Bankruptcy Code, the bankruptcy court is only allowed to make recommendations that this court will have to review *de novo*. Even if not

required, therefore, it makes good sense to begin this case where it will ultimately be decided: here.

## BACKGROUND

### A. Delphi's Bankruptcy

In October 2005, Delphi Corporation and approximately forty of its domestic affiliates (collectively, the "Debtors") filed voluntary Chapter 11 petitions. At the time of its filing, Debtors' bankruptcy "ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets."[1] Last year, Debtors had global net sales of $22.3 billion and global assets of approximately $13.7 billion.

Debtors are manufacturers and suppliers of automotive parts, especially electronics. Prior to 1999, Debtors were owned and operated by General Motors; since 1999, Debtors have operated independently, although GM continues to be their largest customer. When Debtors were spun off from GM, though, they expanded their market beyond North America, and are now "a global supplier of components, integrated systems, and modules for a wide range of customers and applications."

While Debtors were initially profitable after their separation from GM,

---

1 The description of Debtors' business and all related quotations in this section are taken from Debtors' bankruptcy court filings. *See, e.g.*, Debtor's Twenty-Ninth Omnibus Objection Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 to (a) Disallow and Expunge Claims Due to Cure Payments and (b) Modify General Unsecured Claims by Amount of Cure Payments, *available at* www.delphidocket.com (filed Mar. 27, 2008).

generating about $2 billion in net income in the first two years, Debtors subsequently have operated at a loss every year but one. In the last full calendar year prior to filing their bankruptcy, for example, Debtors reported net losses of about $4.8 billion on $28.6 billion in net sales. In Debtors' opinion, their "financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic [original equipment manufacturers] resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices." Accordingly, Debtors filed for bankruptcy protection.

In early 2006, Debtors announced the elements of their proposed plan of reorganization, which emphasized restructuring labor agreements, receiving financial support from GM, and divesting themselves of peripheral business to "streamlin[e] their product portfolio." Debtors filed the plan in September 2007, and filed their first amended plan in December 2007.

On January 25, 2008, the United States Bankruptcy Court for the Southern District of New York (Robert D. Drain, *B.J.*) entered an order confirming Debtors' plan of reorganization. Debtors originally intended to emerge from bankruptcy during the first quarter of 2008, but appear to have recently lost several billion dollars in exit financing, *see* News Release, *Delphi Comments on Plan of*

*Reorganization Closing Efforts*, *available at* www.delphidocket.com (dated Apr. 4, 2008), and are still in bankruptcy.

**B. This Adversary Proceeding**

This adversary proceeding seeks a refund of approximately $26 million in Federal Insurance Contribution Act (FICA) taxes paid to the IRS by Delphi Corporation ("Delphi Corp."), Delphi Automotive Systems LLC f/k/a Delco Electronics Corporation and Delco Electronics LLC ("Delco"), and Delphi Automotive Systems Services LLC ("DASS," and together with Delco and Delphi Corp., "Delphi"). The taxes in dispute were paid on the fourth quarters of 1999 and 2003, in connection with one-time payments made under collective bargaining agreements between Delphi and the United Automobile, Aerospace and Agricultural Implement Workers of America International Union ("UAW").

According to the complaint, *see* Ex. A,[2] representatives of the UAW and the automotive industry reached accord on a three-year national labor agreement in September 1999. Under the terms of the 1999 agreement, Delphi Corp. and Delco were to make one-time lump-sum payments of $1,350 to each qualifying union member upon ratification of the agreement. *See* Compl. ¶ 14. The 1999 agreement was ratified in October 1999, and Delphi Corp. and Delco made the required payments in the fourth quarter of that year. *See* Compl. ¶¶ 16-17. Representatives of the automotive industry and the UAW returned to the bargaining table in late

---

[2] All exhibits cited in this brief are exhibits to the Declaration of Matthew L. Schwartz, dated May 13, 2008.

2003, negotiating another three-year labor agreement. Under the 2003 agreement, union members were to receive $3,000 apiece upon ratification. *See* Compl. ¶ 18. The 2003 agreement was ratified in October 2003, and Delphi Corp., DASS, and Delco all made the required payments in the fourth quarter of that year. *See* Compl. ¶¶ 20-21.

On its consolidated income tax returns, Delphi originally treated both the 1999 and 2003 CBA ratification payments as FICA-taxable wages to its employees, and so paid FICA taxes on those payments to the IRS. *See* Compl. ¶ 23.

Under the Internal Revenue Code, a taxpayer may file a claim for a refund of FICA taxes within three years of the date the return was filed. *See* Internal Revenue Code ("I.R.C.") § 6511.[3] In April 2003, therefore, Delphi Corp. and Delco filed refund claims with the IRS for the FICA taxes on the 1999 payments; they contended that the payments were not made for the performance of employment services, and so were not taxable as wages. *See* Compl. ¶ 24. An IRS examiner proposed to disallow the refund claims, causing Delphi Corp. and Delco to file administrative appeals. *See* Compl. ¶¶ 30-31. Eventually, however, the IRS issued a final notice that it was disallowing the claims. *See* Compl. ¶ 32. Likewise, Delphi Corp., Delco, and DASS filed refund claims in 2007 relating to the FICA taxes on the 2003 payments, making the same argument. *See* Compl. ¶ 33. According to the complaint, the IRS has disallowed Delco and DASS's claims, but had not issued a

---

[3] The provisions of the Internal Revenue Code are codified in title 26 of the United States Code.

final decision on Delphi Corp.'s claim as of the time this case was filed. *See* Compl. ¶ 34.

The IRS's final decision disallowing a taxpayer's refund claim is reviewable in either federal district court or the Court of Federal Claims. *See United States v. Clintwood Elkhorn Mining Co.*, — U.S. —, 128 S.Ct. 1511, 1514 (2008); *see also* 28 U.S.C. § 1346(a)(1) (giving district courts and Court of Federal Claims jurisdiction over "[a]ny civil action . . . for the recovery of any internal-revenue taxes alleged to have been erroneously or illegally assessed or collected"); I.R.C. § 6532(a)(1).[4] Accordingly, Delphi timely filed this adversary proceeding on January 18, 2008. The thrust of the complaint is that the IRS was wrong to consider the 1999 and 2003 payments by Delphi to its union employees as "wages" for purposes of FICA taxes.

On May 13, 2008 — simultaneously with filing this motion to withdraw the reference — the Government filed its answer in the bankruptcy court. *See* Ex. B. An initial status conference is presently scheduled for May 29, 2008.

---

[4] As suggested by the reference to "recovery" of taxes in 28 U.S.C. § 1346, a taxpayer seeking to challenge the IRS's decision in district court must first pay the taxes. *See Magnone v. United States*, 902 F.2d 192, 193 (2d Cir. 1990); *see also United States v. Forma*, 42 F.3d 759, 766 (2d Cir. 1994) ("the Government gets to collect first and taxpayers can ask questions in the district courts only later"). A taxpayer who does not want to pay in full prior to bringing suit is "free to litigate in the Tax Court without any advance payment." *Flora v. United States*, 357 U.S. 63, 75 (1958), *aff'd on reh'g*, 362 U.S. 145 (1960).

## ARGUMENT

## THIS ADVERSARY PROCEEDING SHOULD BE LITIGATED IN DISTRICT COURT

### A. Withdrawal of the Reference, Generally

In 1982, the Supreme Court ruled unconstitutional the broad grant of jurisdiction to bankruptcy judges contained in the Bankruptcy Act of 1978, which included the authority to hear and finally determine all bankruptcy-related matters. *See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982). Congress reacted by enacting the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333 (1984). Section 104 of the Act created 28 U.S.C. § 157, which defines the relationship between bankruptcy courts and district courts.

Despite the fact that district courts have "original and exclusive jurisdiction of all cases under title 11," 28 U.S.C. § 1334(a), a district court may "refer[] to the bankruptcy judges for the district" any or all bankruptcy cases. 28 U.S.C. § 157(a). Since 1984, all bankruptcy cases in this district have been referred to the bankruptcy courts. *See* Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting *C.J.*).

Once a case has been referred to the bankruptcy court, the extent to which that court may "finally determine" a matter depends on the case. A bankruptcy judge can "hear and determine" cases "under" title 11 as well as so-called "core proceedings." 28 U.S.C. § 157(b). But, absent the parties' consent, a bankruptcy

judge may only submit proposed findings of fact and conclusion of law in non-core proceedings, which are to be reviewed *de novo* by a district judge. *See* 28 U.S.C. § 157(c).

Finally, the district court may always withdraw the reference of a case (or part of a case) to the bankruptcy court and re-assert its exclusive jurisdiction:

> The district court *may* withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court *shall*, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d) (emphases supplied). The two sentences of section 157(d) are read separately, and are generally referred to as, respectively, the "permissive" and the "mandatory" withdrawal provisions. "A motion for withdrawal of a case or proceeding shall be heard by a district judge." Fed. R. Bankr. P. 5011(a).

**B. This Adversary Proceeding Is Subject to Mandatory Withdrawal of the Reference Because It Implicates Substantial Questions of Federal Tax Law**

Delphi's complaint makes clear that its right to a tax refund rests upon its arguments that the IRS's construction of the term "wages" in the Internal Revenue Code "is contrary to statute and regulations" and that, in applying its definition retroactively, the IRS "abused its discretion." *E.g.*, Compl. ¶¶ 41-42. Thus, the resolution of this case necessarily will require substantial interpretation of the tax laws, making withdrawal of the reference mandatory.

### 1. Withdrawal of the Reference Is Mandatory Whenever a Proceeding Involves "Significant Interpretation" of Non-Bankruptcy Federal Law

The mandatory withdrawal provision specifies that a "district court *shall* . . . withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d) (emphasis supplied). This is undisputedly such a case.

The purpose of the mandatory withdrawal provision is "to assure that an Article III judge decides issues calling for more than routine application of [federal] statutes outside the Bankruptcy Code." *In re Horizon Air*, 156 B.R. 369, 373 (N.D.N.Y. 1993) (citing *Eastern Airlines, Inc. v. Air Line Pilots Assoc. (In re Ionosphere Clubs, Inc.)*, No. 89 Civ. 8250 (MBM), 1990 WL 5203, at *5 (S.D.N.Y. Jan. 24, 1990)). Thus, section 157(d) requires withdrawal of the reference for any proceeding "that would otherwise require a bankruptcy court judge to engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes." *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991); *see also United States Gypsum Co. v. National Gypsum Co. (In re National Gypsum Co.)*, 145 B.R. 539, 541 (N.D. Tex. 1992).

Under this standard, a district court is required to withdraw the reference whenever "substantial and material consideration of non-Bankruptcy Code federal statutes is necessary for the resolution of the proceeding." *Shugrue v. Air Line Pilots Assoc. (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 995 (2d Cir. 1990)

(internal quotation marks omitted); *see also McCrory Corp. v. 99¢ Only Stores (In re McCrory Corp.)*, 160 B.R. 502, 505 (S.D.N.Y. 1993) (same). Courts in this circuit have "recognized that the mandatory withdrawal standard is more easily satisfied when complicated issues of first impression are implicated under non-bankruptcy federal laws," *Keene Corp. v. Williams Bailey & Wesner, LLP (In re Keene Corp.)*, 182 B.R. 379, 382 (S.D.N.Y. 1995), but in fact the mandatory withdrawal provision of section 157(d) requires withdrawal of the reference whenever a proceeding pending in bankruptcy court involves anything more than the routine application of non-bankruptcy laws. *See In re Keene Corp.*, 182 B.R. at 382 (withdrawal of the reference "warranted when resolution of the matter would require the bankruptcy judge to 'engage in significant interpretation, as opposed to simple application,' of federal non-bankruptcy statutes" (quoting *Exxon*, 932 F.2d at 1026)).

"Withdrawal of the reference may also be mandated where 'issues arising under non-title 11 laws dominate[] those arising under title 11. . . .'" *Enron Corp. v. J.P. Morgan Secs., Inc. (In re Enron Corp.)*, Nos. 07 Civ. 10527 (SAS), 07 Civ. 10530 (SAS), 2008 WL 649770, at *4 (S.D.N.Y. Mar. 10, 2008) (ellipsis in original) (quoting *In re Texaco Inc.*, 84 B.R. 911, 921 (S.D.N.Y. 1988)). "In such cases, a district court does not have discretion to deny a petition for withdrawal." *American Tel. & Tel. Co. v. Chateaugay Corp.*, 88 B.R. 581, 584 (S.D.N.Y. 1988).

Courts applying these standards routinely withdraw the reference in cases that implicate substantial questions of tax law. *See, e.g., In re G-I Holdings*, 295 B.R. 222, 224 (D.N.J. 2003) (holding withdrawal was mandatory where proceeding

required significant interpretation of federal tax statutes, case was factually complex one regarding whether disguised sale occurred for tax purposes, and case was one of first impression); *In re CM Holdings, Inc.*, 221 B.R. 715, 722-24 (D. Del. 1998) (holding withdrawal was mandatory where objection to IRS claim presented unsettled issues of law, as well as issues of first impression, relating to tax treatment of corporate-owned life insurance); *In re Ionosphere Clubs, Inc.*, 142 B.R. 645, 649 (S.D.N.Y. 1992) (holding withdrawal was mandatory where resolution of adversary proceeding required significant interpretation of Internal Revenue Code and ERISA); *In re Oil Company*, 140 B.R. 30, 34-35 (E.D.N.Y. 1992) (holding withdrawal was mandatory where objection to IRS claim presented issues of first impression under Internal Revenue Code); *In re Pan Am Corp.*, 133 B.R. 700, 704 (S.D.N.Y. 1991) (holding withdrawal was mandatory where objection to claim involved interaction of Bankruptcy Code, Internal Revenue Code, and ERISA); *see also Century Hotels v. United States*, 952 F.2d 107, 108 n.1 (5th Cir. 1992) (noting that district court had withdrawn the reference of adversary proceeding seeking turnover of property and asserting wrongful levy claim under I.R.C. § 7426). *See generally* T. Keith Fogg, Grover Hartt, III & Mark S. Wallace, *When, Why, and How Should a District Court Be Asked to Withdraw the Reference of a Tax Controversy to a Bankruptcy Court?*, 20 Prac. Tax. Law. 41 (2006).[5] These cases also confirm the readily apparent proposition that the Internal Revenue Code contains non-

[5] Of course, where issues of tax law do not involve substantial questions, the bankruptcy court is fully empowered to "determine the amount or legality of any tax." 11 U.S.C. § 505(a)(1).

bankruptcy "laws of the United States regulating organizations or activities affecting interstate commerce," 28 U.S.C. § 157(d). *See, e.g., In re CM Holdings*, 221 B.R. at 721 ("the federal Tax Code must be consulted in order to determine the validity of the IRS' claims and federal tax law regulates organizations or activities affecting interstate commerce, as required under 28 U.S.C. § 157(d)").

Under any standard, this is a case for mandatory withdrawal. It presents several substantial questions of first impression requiring the interpretation of the Internal Revenue Code and administrative law principles, generally. Any one of them provides a satisfactory basis for mandatory withdrawal.

**2. Resolution of this Case Will Require the Court to Determine Whether Delphi's 1999 and 2003 Payments Were "Wages," Which Requires Substantial Interpretation of the Tax Laws**

This case turns on whether the 1999 and 2003 CBA ratification payments by Delphi to its union employees are taxable "wages," within the meaning of the Internal Revenue Code. That is both a legally and factually difficult question, the answer to which is of great interest to the automotive industry generally. As noted above, Delphi is not the only automotive-sector company to seek a refund on these grounds: Ford has filed a similar suit in the Court of Federal Claims, *see* Ex. C, and GM and Saturn have filed one in Michigan, *see* Ex. E. The complexity of the issues raised by this suit illustrates why withdrawal of the reference is mandatory in this case.

### a. The Law of Federal Insurance Contribution Act Taxes

The FICA tax funds Social Security and Medicare benefits. *See* I.R.C. §§ 3101-3128. FICA taxes (like income taxes) are imposed on both employees and employers, *see* I.R.C. §§ 3101, 3111, and regardless of who is paying, FICA taxes are imposed on all "wages" paid to an employee "with respect to employment." I.R.C. § 3101(a) & (b). For purposes of FICA, the term "wages" is defined, with exceptions not relevant here, to mean "all remuneration for employment." I.R.C. § 3121(a). "Employment" means "any service, of whatever nature, performed . . . by an employee for the person employing him." I.R.C. § 3121(b). The Treasury Regulations clarify that, for FICA tax purposes, "the name by which the remuneration for employment is designated is immaterial. Thus, salaries, fees, bonuses, and commissions on sales or on insurance premiums are wages if paid as compensation for employment." 26 C.F.R. § 31.3121(a)-1(c).[6]

Taken together, therefore, "wages" for FICA purposes are "all remuneration for" "any service, of whatever nature, performed . . . by an employee for the person employing him," regardless of what the payment is called. I.R.C. § 3121; 26 C.F.R. § 31.3121(a)-1(c). Beyond the statutes and regulations, the IRS has on several occasions issued formal guidance — in the form of "revenue rulings" — considering specifically whether, and under what circumstances, certain lump-sum payments should be considered taxable wages.

---

[6] Income taxes are likewise tied to "wages." For income tax purposes, wages are "all remuneration for services performed by an employee for his employer." I.R.C. § 3401(a); *see also* 26 C.F.R. § 31.3401(a)-1(a)(2).

**i. Revenue Ruling 58-145**

In 1958, the IRS issued Revenue Ruling 58-145, which considers whether either of two different kinds of signing bonuses paid to a baseball player are "wages" for income tax withholding (not FICA) purposes.

> A baseball club pays two types of bonuses to baseball players. One type of bonus is paid to a new player solely for signing his first contract, without any requirement of subsequent service. This type of bonus is not contingent upon whether the player is retained by the club after a specified time. The second type of bonus is awarded as a consideration for the new player's signing his first contract, but the payment of a portion of such bonus is dependent upon subsequent service by the player or upon his being retained by the club after a specified date.

Rev. Rul. 58-145, *available at* 1958 WL 10767. The IRS concluded that the first type of bonus — not contingent on the performance of future services and paid to the player "solely for signing his first contract" — is not wages because it is not remuneration for services. But with respect to the second type of bonus, the IRS came to the opposite conclusion. That type of bonus, or any bonus "predicated on continued employment," was to be included in wages for income tax purposes.

The IRS subsequently issued several related Revenue Rulings. In a 1969 Ruling, the IRS concluded that payments made by a baseball team for educational expenses of a minor league player still in college were "compensation for past, present or future employment services" and were therefore wages. *See* Rev. Rul. 69-424, *available at* 1969 WL 18685. Subsequently, the IRS distinguished the 1969 Ruling from Revenue Ruling 58-145, noting that scholarship payments were integral to the employment contract under which the player agreed to play baseball

for a specified sum. *See* Rev. Rul. 71-532, *available at* 1971 WL 26820. And in 1974, the IRS considered whether a payment by a U.S. soccer team to a foreign player in consideration for him not negotiating with any other team in the league was wages for income tax purposes. The IRS concluded that it was not. Relying on Revenue Ruling 58-145, the IRS reasoned that "[t]he sign on fee, or bonus, was paid to insure that if the nonresident alien individual did play professional soccer, he would provide his services for the taxpayer only and to no other professional soccer club," and so was not a fee for services. Rev. Rul. 74-108, *available at* 1974 WL 34853.

**ii. Revenue Ruling 2004-109**

In 2004, the IRS issued its latest rulings about the tax treatment of bonus payments and, in the process, spoke for the first time about whether signing bonuses constitute wages specifically for FICA (as opposed to income tax) purposes. The IRS also addressed for the first time whether CBA ratification bonuses constitute wages for FICA purposes. *See* Rev. Rul. 2004-109, *available at* 2004 WL 2659666.

Revenue Ruling 2004-109 addressed two situations. The first situation was identical to the first situation in Revenue Ruling 58-145: a baseball player receives a bonus for signing his first contract; the bonus is contingent only on the player showing up at Spring training, but is not (according to the contract) contingent on the player's future performance of services. The second situation addressed in Revenue Ruling 2004-109 was new:

> An employer negotiates a collective bargaining agreement (CBA) with a union representing a group of its employees. The CBA will take effect on the "ratification date," which is the date it is ratified by a majority of the union members covered by the agreement. The CBA provides that each employee covered by the terms of the agreement who is employed by the employer as of the ratification date received a bonus. Each such employee is paid the same amount regardless of compensation, seniority, position and whether or not the employee voted for ratification. In addition, each eligible employee receives the payment even if the employee had not performed services for the employer before the ratification date. Finally, the CBA provides that the payment is not contingent on the employee's future performance of services.

*Id.*

The Revenue Ruling concludes that the payments in *both* situations are wages for FICA purposes because the employees do not provide "clear, and adequate consideration . . . that is not dependant upon the employer-employee relationship and its component terms and conditions." *Id.* Specifically, with respect to the first (baseball player) scenario, the signing bonus is paid "in connection with establishing the employer-employee relationship." *Id.* Likewise, with respect to the second (CBA ratification) situation, the Ruling holds that the payments are made "as part of a bargain that establishes the terms and conditions of the employment relationship with all of the employees covered by the CBA." *Id.* In both instances, the Ruling concludes that these bonus payments are part of the compensation the employer pays as remuneration for employment, citing the relevant provisions of the Internal Revenue Code and its regulations that define "wages." *See id.*; *see also* I.R.C.§§ 3121(a), 3306(b), 3401(a); 26 C.F.R. §§ 31.3121(a)-1(b), 31.3306(b)-1(b), 31.3401(a)-1(a)(1) (collectively, defining wages); *and* I.R.C. §§ 3112(b), 3306(c); 26

C.F.R. §§ 31.3121(b)-3(b), 31.3306(c)-2(b) (collectively, explaining that any service of whatever nature performed by an employee for the person employing him is employment, unless a specific exemption applies).

Thus, Revenue Ruling 2004-109 explicitly revoked Revenue Ruling 58-145 as it applied to the baseball player scenario. The 2004 Ruling explained:

> [Revenue Ruling 58-145] erred in its analysis by failing to apply the [Internal Revenue] Code and regulations appropriately to the question of whether the bonus was wages. . . . Specifically, it failed to apply the correct definition of wages and to consider whether the bonus was paid in connection with establishing the employer-employee relationship.

The 2004 ruling also revoked Revenue Ruling 74-108 — the one about foreign soccer players' non-competition agreements — because it had relied on the 1958 ruling.[7]

Consistent with the IRS's view that "wages" for FICA purposes encompasses any income received that sets the terms and conditions of an employer-employee relationship, the IRS issued a second ruling simultaneously with 2004-109. In that one, the IRS concluded that when an employment contract is terminated and the employee receives a lump-sum separation payment, that payment also is treated as wages for FICA purposes. *See* Rev. Rul. 2004-110, *available at* 2004 WL 2659667. *See generally* Department of the Treasury News Release, *Treasury and IRS Clarify Employment Tax Treatment of Payments Made on the Signing or Cancellation of an Employment Contract*, at 2004 WL 2669356 (Nov. 23, 2004).

---

[7] The 2004 ruling also concluded that Revenue Rulings 69-424 and 71-532 — the ones dealing with a baseball team's payments to a minor league player for educational expenses — were obsolete in view of amendments to the Internal Revenue Code contained in the Tax Reform Act of 1986.

**b. CBA Ratification Payments Are "Wages"**

One of the central legal questions in this case is whether Revenue Ruling 2004-109 represents appropriate guidance from the IRS, specifically with respect to the CBA ratification payment scenario. The Government contends that it does.

The interpretation of the term "wages" in the 2004 Revenue Ruling as covering all payments made "as part of a bargain that establishes the terms and conditions of the employment relationship" is wholly consistent with the statute and regulations — which define wages as "all remuneration for employment," *i.e.*, for "any service, of whatever nature, performed . . . by an employee for the person employing him." I.R.C. §§ 3121(a) & (b). Moreover, the 2004 Revenue Ruling is consistent with long-standing Supreme Court precedent.

In *Social Security Board v. Nierotko*, 327 U.S. 358 (1946), the Court held that back pay awarded under the National Labor Relations Act to an employee who had been wrongfully discharged constituted "wages" under the Social Security Act. In so doing, the Court specifically noted that the back pay constituted remuneration for "employment," even though that the back pay related to a period during which the petitioner did not actually perform any services. The Court emphasized the extraordinary breadth of the term "employment":

> The very words 'any service . . . performed . . . for his employer,' with the purpose of the Social Security Act in mind, import breadth of coverage. They admonish us against holding that 'service' can be only productive activity. We think that 'service' as used by the Congress in this definitive phrase means not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer.

*Id.* at 365-66 (alterations in original, footnote omitted).

Although *Nierotko* was a social security benefits case, its analysis is fully applicable to FICA taxes for two reasons. *First*, strictly as a textual matter, the Social Security Act defines "wages" and "employment" virtually identically to the Internal Revenue Code, for FICA purposes. The version of the Social Security Act at play in *Nierotko* defined wages as "all remuneration for employment" and employment as "any service, of whatever nature, performed within the United States by an employee for his employer." 327 U.S. at 362-63. *Compare* I.R.C. §§ 3121(a) & (b) (defining wages as "all remuneration for employment," and employment as "any service, of whatever nature, performed . . . by an employee for the person employing him"). *Second*, although *Nierotko* is a social security benefits case, its definition of "wages" and "employment" is informed by the fundamental policy behind the Social Security system that FICA funds. As both a textual and policy matter, therefore, *Nierotko*'s reasoning explains the breadth of the term "wages" for FICA purposes. *See, e.g., Mayberry v. United States*, 151 F.3d 855, 860 (8th Cir. 1998) (applying *Nierotko*'s definition of wages and employment in the FICA refund context, holding that, for FICA purposes, those terms' definitions "are worded so as to 'import breadth of coverage'"); *see also University of Pittsburgh v. United States*, 507 F.3d 165, 168 (3d Cir. 2007) (same); *North Dakota State Univ. v. United States*, 255 F.3d 599, 603 (8th Cir. 2001) (same); *Abrahamsen v. United States*, 228 F.3d 1360, 1364 (Fed. Cir. 2000) (same); *Gerbec v. United States*, 164 F.3d 1015, 1026 (6th Cir.1999) (same); *Donnell v. United States*, 50 Fed. Cl. 375,

381-82 (2001) (same); *Greenwald v. United States*, No. 98 Civ. 3439 (DC), 2000 WL 16939, at *2-3 (S.D.N.Y. Jan. 10, 2000) (same).

Applying these standards, it is clear that the CBA ratification payments described in the 2004 Revenue Ruling were made as part of "the entire employer-employee relationship" that *Nierotko* holds is encompassed within the term "employment." At the very least, the 2004 Revenue Ruling's conclusion that there is no "clear, and adequate consideration" provided by the employee *outside* of the employer-employee relationship in that scenario is valid. As a result, the 2004 Revenue Ruling is correct, and Delphi's payments were properly treated as wages.

**3. Resolution of this Case Will Also Require This Court to Consider What Level of Deference Revenue Rulings Are Due**

The foregoing discussion assumes that the IRS's position as stated in Revenue Ruling 2004-109 would be reviewed by this court *de novo*. But that is not correct; it is well-established that revenue rulings are due substantial judicial deference. An important question exists, however, over how much deference they are due, especially in light of the Supreme Court's decision in *United States v. Mead Corp.*, 533 U.S. 218 (2001).

Prior to *Mead*, it was settled law in the Second Circuit that "a Revenue Ruling is 'entitled to *great deference*' and is presumed to have '*the force of legal precedent* unless unreasonable or inconsistent with the provisions of the Internal Revenue Code.'" *Weisbart v. U.S. Dep't of Treasury*, 222 F.3d 93, 98 (2d Cir. 2000) (emphases supplied) (quoting *Texasgulf, Inc. v. Commissioner of Internal Revenue*, 172 F.3d 209, 217 (2d Cir. 1999), and *Gillespie v. United States*, 23 F.3d 36, 39 (2d

Cir. 1994)). This is because

> ever since the inception of the Tax Code, Congress has seen fit to vest in those administering the tax laws very broad authority to interpret those laws. In an area as complex as the tax system, the agency Congress vests with administrative responsibility must be able to exercise its authority to meet changing conditions and new problems. [T]his Court has long recognized the primary authority of the IRS and its predecessors in construing the Internal Revenue Code.

*Bob Jones Univ. v. United States*, 461 U.S. 574, 596 (1983) (upholding IRS determination made by revenue ruling); *see United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 220 (2001) (reasonable revenue rulings "attract[] substantial judicial deference" where they reflect longstanding interpretation of tax regulations); *United States v. Correll*, 389 U.S. 299, 306-07 (1967) (deferring to IRS in administration of tax laws and to "make appropriate adjustments").

The Second Circuit has never decided whether revenue rulings — like Treasury Regulations, *see Atlantic Mut. Ins. Co. v. Commissioner of Internal Revenue*, 523 U.S. 382, 387-89 (1998) — deserve the full deference under *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See, e.g., Riemels v. Commissioner of Internal Revenue*, 436 F.3d 344, 347 n.2 (2d Cir. 2006) ("The parties disagree over the proper amount of deference to afford revenue rulings, an issue that has not been addressed by this Circuit since the Supreme Court's decision in [*Mead*]"); *Fallu Prods., Inc. v. United States*, No. 06 Civ. 13248 (DLC), 2008 WL 397912, at *2 n.4 (S.D.N.Y. Feb. 13, 2008) (noting that whether revenue rulings are entitled to *Chevron* deference is an open question in this circuit after *Mead*); *Fortis, Inc. v. United States*, 420 F. Supp. 2d 166, 178-79

(S.D.N.Y. 2004) ("There is some doubt as to whether revenue rulings are necessarily entitled to such deference after the Supreme Court's mor recent decisions").[8] The Supreme Court, however, has made it clear that while notice-and-comment rulemaking and formal adjudication almost always assure *Chevron* deference, the absence of such formalities does not preclude deference, so long as it appears that Congress intended to grant the agency the power to make rules with the "force of law" and "the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead Corp.*, 533 U.S. at 226-27, 230-31 (refusing to accord *Chevron* deference to a tariff classification ruling, citing lack of congressional intent to delegate to United States Customs Service general authority to make rules

---

[8] Only one court in this circuit has directly addressed whether revenue rulings are entitled to *Chevron* deference, concluding that they do not. *See In re WorldCom, Inc.*, 371 B.R. 19, 31-32 (Bankr. S.D.N.Y. 2007). That decision — which the Government believes was wrongly decided — left open the equally important question of what level of deference revenue rulings do deserve.

If revenue rulings are not entitled to *Chevron* deference, they at least retain the "great deference" that the Second Circuit accorded them under *Weisbart* and its predecessors — cases that did not rely on *Chevron* and are thus unaffected by *Mead*'s enunciation of limits on when *Chevron* deference is applicable. *See WorldCom*, 371 B.R. at 30 (noting that the *Weisbart*/*Texasgulf*/*Gillespie* "lines of cases did not explicitly rely on *Chevron*"). Continuing "great deference" to revenue rulings accords with *Mead*, which directed courts to give deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), to agency determinations when *Chevron* deference is not appropriate. Under that standard, "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *Mead*, 533 U.S. at 228 (footnotes omitted); *accord Aeroquip-Vickers, Inc. v. Commissioner of Internal Revenue*, 347 F.3d. 173, 181 (6th Cir. 2003) (granting "substantial judicial deference" under *Mead*/*Skidmore* to longstanding revenue ruling). *See also Auer v. Robbins*, 519 U.S. 452 (1997) (holding that agency's interpretation of its own *regulation* is entitled to deference).

with force of law); *accord Barnhart v. Walton*, 535 U.S. 212, 221-222 (2002) (according *Chevron* deference to an agency interpretation reached through "means less formal than 'notice and comment' rulemaking").

The IRS promulgates revenue rulings pursuant to its statutory authority to "prescribe all needful rules and regulations for the enforcement of" the Internal Revenue Code. I.R.C. § 7805(a); Treas. Order 111-2, *available at* 1981 WL 127095. Revenue rulings are formal interpretative rulings involving "substantive tax law." 26 C.F.R. § 601.601(d)(2)(v)(a). They are issued by the IRS National Office and published in the Internal Revenue Bulletin as the agency's "official" position to guide taxpayers and IRS officials alike. *Id.* § 601.601(d)(2)(i)(a). Revenue rulings are written and reviewed at the same levels within the IRS and the Treasury Department as notice-and-comment regulations. *See* Treas. Order 111-2. Like regulations, revenue rulings have legal force and effect, as they are "precedents to be used in the disposition of other cases" that "may be cited and relied upon for that purpose." 26 C.F.R. § 601.601(d)(2)(v)(d). And a taxpayer's disregard of applicable revenue rulings can result in the imposition of penalties. *See* I.R.C. § 6662; 26 C.F.R. § 1.6662-3(b)(2).

For these reasons, the Government believes that revenue rulings have the "force of law" within the meaning of *Mead*, and *Chevron* deference is therefore required. *See Mead*, 533 U.S. at 227; *see also Environmental Defense v. Duke Energy Corp.*, — U.S. —, 127 S.Ct. 1423, 1433 (2007) (favorably citing *Cleveland Indians Baseball*, 532 U.S. at 220, and suggesting that revenue rulings are still

entitled to "substantial judicial deference"); *Christensen v. Harris County*, 529 U.S. 576, 590-91 (2000) (Scalia, *J.*, concurring) (noting that "we have accorded *Chevron* deference not only to agency regulations, but to authoritative agency positions set forth in a variety of other formats," and citing cases). *See generally* Ryan C. Morris, Comment, *Substantially Deferring to Revenue Rulings After Mead*, 2005 B.Y.U. L. Rev. 999 (2005) (arguing that revenue rulings are still entitled to full *Chevron* deference). Some courts, admittedly, have come to the opposite conclusion. *See, e.g., Aeroquip-Vickers, Inc. v. Commissioner of Internal Revenue*, 347 F.3d. 173 (6th Cir. 2003) (granting deference, but not *Chevron* deference, to revenue rulings after *Mead*); *Dominion Res., Inc. v. United States*, 219 F.3d 359, 366 (4th Cir. 2000) (revenue rulings entitled to "less deference" than regulations). The determination of the appropriate weight to afford IRS revenue rulings is therefore a substantial one — both in terms of the analysis involved and the import to the administration of the tax laws — that should be decided in this court.

**4. Resolution of this Case Will Require This Court to Determine When, and Under What Circumstances, Revenue Rulings May Be Applied Retroactively**

Even assuming that this Court agrees with the IRS that Delphi's 1999 and 2003 payments to its union employees were taxable wages for FICA purposes — either because Revenue Ruling 2004-109 is entitled to conclusive deference, or because this Court conducts its own analysis of the Internal Revenue Code and comes to the same conclusion as the IRS, or both — there may still be at least one more important issue that requires withdrawal of the reference here: Delphi's

claim that the IRS's retroactive application of its 2004 ruling to tax periods in 1999 and 2003 was improper. *E.g.,* Compl. ¶ 42.

Under the Treasury Regulations, "Revenue Rulings, other than those relating to the qualification of pension, annuity, profit-sharing, stock bonus, and bond purchase plans, apply retroactively unless the Revenue Ruling includes a specific statement indicating . . . the extent to which it is to be applied without retroactive effect." 26 C.F.R. § 601.601(d)(2)(v)(c). *See also* I.R.C. § 7805(b)(8) (the "Secretary may prescribe the extent, if any, to which any ruling . . . relating to the internal revenue laws shall be applied *without* retroactive effect." (emphasis supplied)). When a revenue ruling revokes or modifies an existing ruling, however, the IRS generally will not apply the new ruling retroactively to the extent the new ruling may adversely affect taxpayers who relied on the old one. *See* 26 C.F.R. § 601.601(d)(2)(v)(c).

Consistent with these regulations, the IRS specified in Revenue Ruling 2004-109 the scope of its retroactive application:

> the Service will not apply the position adopted in this ruling to any signing bonus, sign-on fee, or similar amount paid to an employee in connection with the employee's initial employment with the employer pursuant to a sign-on agreement or other contract entered into before January 12, 2005, provided the amount is paid under facts and circumstances that are substantially the same as in Rev. Rul. 58-145 or Rev. Rul. 74-108.

Delphi contends that the "IRS abused its discretion in Revenue Ruling 2004-109 when determining that its revocation of Revenue Ruling 58-145 would be retroactive with respect to ratifying bonuses under collective bargaining

agreements." *E.g.*, Compl. ¶ 42. *See generally Automobile Club of Michigan v. Commissioner of Internal Revenue*, 353 U.S. 180, 184 (1957) (holding that Commissioner's decision to have revenue ruling apply retroactively reviewed for abuse of discretion); *Chock Full O' Nuts Corp. v. United States*, 453 F.2d 300, 302-03 (2d Cir. 1971) (same, but adding that "[t]o the extent that a regulation interprets or elucidates the meaning of a statute, it is merely explanatory or confirmatory rather than retroactive").

The Government contends that the 2004 Revenue Ruling was appropriately applied to Delphi because, until then, the IRS had never spoken directly either about the treatment of bonus payments for FICA (as opposed to income tax) purposes generally, or specifically about the tax treatment of CBA ratification payments like Delphi's. Delphi will surely contend that it relied on the 1958 Revenue Ruling in making its refund request (bringing it within the exception to the 2004 Ruling's retroactive effect), but if it did, it did so only by analogy. The differences between a signing bonus paid to an individual baseball player and a ratification bonus paid to all union members are sufficiently distinguishable that the Commissioner's decision to apply the 2004 ruling retroactively cannot be called an abuse of discretion. Indeed, the fact that the 2004 ruling treated the baseball player and the CBA scenarios separately nicely illustrates that, while raising similar issues, they are not analytically identical. Moreover, the 1958 ruling dealt only with withholding for income tax, not FICA, purposes, and while the two sections of the Internal Revenue Code define "wages" similarly, they are not read

entirely in parallel. *See* I.R.C. § 3121(a).[9] Indeed, counsel for Delphi recognized years ago that the 1958 ruling was shaky precedent in the CBA ratification payment context, especially with respect to FICA taxes. *See* Mary B. Hevener & Anne G. Batter, *When Are Payments From an Employer to an Employee Not "Wages" Subject to Employment Taxes?*, 95 J. Tax'n 349 (2001). Delphi's payments therefore do not fall within the retroactivity exception in the 2004 Revenue Ruling because those payments were not made "under facts and circumstances that are substantially the same as" the 1958 Revenue Ruling.

* * *

Put simply, if Delphi is going to win this case, it is going to have to make substantial tax law in the process: the Court would either have to conclude that the IRS so misunderstands its own statutes that the 2004 Revenue Ruling that is squarely on point is contrary to the plain language of the Internal Revenue Code, or else that, though correct, the Commissioner abused his considerable discretion in

---

[9] The language at the very end of I.R.C. § 3121(a) specifies that "[n]othing in the regulations prescribed for purposes of chapter 24 (relating to income tax withholding) which provides an exclusion from 'wages' as used in such chapter shall be construed to require a similar exclusion from 'wages' in the regulations prescribed for purposes of [FICA]." This provision is popularly called the anti-*Rowan* amendment, because it was passed in response to the Supreme Court's decision in *Rowan Companies v. United States*, 452 U.S. 247 (1981), where the Court held that the term "wages" should be construed identically for income tax and FICA purposes. *See also* S. Rep. No. 98-23, at 41 (1983), *as reprinted in* 1983 U.S.C.C.A.N. 143, 183 ("Since the [social] security system has objectives which are significantly different from the objective underlying the income tax withholding rules, the Committee believes that amounts exempt from income tax withholding should not be exempt from FICA unless Congress provides an explicit FICA tax exclusion.").

applying the ruling to Delphi. The Government, it goes without saying, is confident that Delphi will not prevail because, under any standard, the IRS's position is correct and the 2004 ruling is entirely in harmony with the tax code. But where victory for either party turns on a substantial interpretation of the tax laws, the case should be litigated in district court. Withdrawal of the reference is, for that reason, mandatory in this case.

### C. This Court Should Withdraw the Reference as a Matter of Discretion

Even if withdrawal of the reference were not mandatory, this case would still belong in district court. Section 157(d) provides that a "[d]istrict court *may* withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d) (emphasis supplied). Although the statute does not define "cause,"

> in deciding whether to withdraw an issue from the bankruptcy court, the district court should weigh several factors, of which the first is the most important: (1) whether the claim is core or non-core, (2) what is the most efficient use of judicial resources, (3) what is the delay and what are the costs to the parties, (4) what will promote uniformity of bankruptcy administration, (5) what will prevent forum shopping, and (6) other related factors.

*South Street Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94 F.3d 755, 762 (2d Cir. 1996); *see also Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993).

Each and every one of these factors weigh in favor of withdrawal of the reference.

### 1. This Adversary Proceeding Is a Non-Core Proceeding

"A district court considering whether to withdraw the reference should first evaluate whether the claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn." *Orion Pictures*, 4 F.3d at 1101; *see also Burger Boys*, 94 F.3d at 762 (identifying the core/non-core distinction as the "most important" factor).[10] Generally, "a proceeding is core if it invokes a substantive right provided by title 11 or if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case." *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999) (internal citations omitted.). *See also In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702, 706 (2d Cir. 1995) ("a claim filed against the estate is a core proceeding because it could arise only in the context of bankruptcy"); *Security Farms v. Internat'l Brotherhood of Teamsters*, 124 F.3d 999, 1008 (9th Cir. 1997) ("Actions that do not depend on bankruptcy laws for their existence and that could proceed in another court are considered 'non-core.'"). *See generally* 28 U.S.C. § 157(b)(2) (providing non-exhaustive list of core proceedings).

---

[10] "While the question whether the proceeding sought to be withdrawn is core or non-core is significant, it is not dispositive. A core proceeding . . . may be withdrawn 'based on a finding by the Court that the withdrawal of reference is essential to preserve a higher interest.'" *In re Parmalat Finanziaria S.p.A.*, 320 B.R. 46, 50 (S.D.N.Y. 2005) (footnotes omitted; quoting *Pan Am Corp. v. Delta Air Lines, Inc. (In re Pan Am Corp.)*, 163 B.R. 41, 43 (S.D.N.Y. 1993)) (granting motion to withdraw, finding that "[i]n this case, there is a higher interest, and that is an overriding consideration of judicial efficiency"). *See also, e.g.*, *LTV Steel Co. v. City of Buffalo (In re Chateaugay Corp.)*, No. 00 Civ. 9429 (SHS), 2002 WL 484950, at *6 (S.D.N.Y. Mar. 29, 2002); *Mishkin v. Ageloff*, 220 B.R. 784, 800 (S.D.N.Y. 1998) (finding that a matter is "core" is not dispositive because "[i]n the final analysis, the critical question is efficiency and uniformity").

An adversary proceeding brought by a debtor for the purpose of obtaining a tax refund is not a core proceeding. As the Ninth Circuit has squarely held, "tax refund claims do not depend on Title 11 for their existence, but instead depend on 28 U.S.C. § 1346(a)(1), and the [debtor] could have brought them in the district court." *Dunmore v. United States*, 358 F.3d 1107, 1115 (9th Cir. 2004).[11]

**2. Withdrawal of the Reference Is in the Interests of Judicial Economy**

Because this is a non-core proceeding, judicial economy also favors withdrawal. As noted in the discussion beginning on page 8, a bankruptcy judge can "hear and determine" core proceedings, 28 U.S.C. § 157(b), but may only submit proposed findings of fact and conclusions of law in non-core proceedings, which are to be reviewed *de novo* by a district judge, *see* 28 U.S.C. § 157(c). *See also Dunmore*, 358 F.3d at 1115 (bankruptcy court abused its discretion by entering final findings of fact and conclusions of law because tax refund adversary proceeding was non-core). Withdrawal of the reference will therefore streamline the litigation by having the district court address these non-core issues in the first instance. *See Orion Pictures*, 4 F.3d at 1101 ("the fact that a bankruptcy court's determination on non-core matters is subject to *de novo* review by the district court could lead the latter to conclude that in a given case unnecessary costs could be avoided by a

[11] While there is a slight split in authority over whether a refund claim becomes core when the IRS asserts an offset, *compare Gordon Sel-Way, Inc. v. United States (In re Gordon Sel-Way, Inc.)*, 270 F.3d 280 (6th Cir.2001) (holding that assertion of offset makes the claim core), *with Dunmore*, 358 F.3d at 1115 (holding that refund claim was still non-core), the IRS does not assert an offset in this case. *See* Ex. B.

single proceeding in the district court").[12]

Litigating this case in district court also serves judicial economy because it will benefit immensely from the availability of a magistrate judge. Although the ultimate issues in the case may be legal ones, there is sure to be substantial discovery. *First*, the nature of the CBA payments is a critical area for discovery. If the CBA payments were actually for services performed, then they are undoubtedly subject to FICA taxes. Determining the true nature of the bonus payments, however, will require the parties to dig deeper than the text of the CBA — after all, "the name by which the remuneration for employment is designated is immaterial," 26 C.F.R. § 31.3121(a)-1(c). And that, in turn, will mean exploring the history of the CBA negotiations, including taking discovery from the UAW and from the lead negotiators for the automotive industry.

*Second*, Delphi is likely to want to explore the administrative deliberative process underlying the promulgation of the 2004 Revenue Ruling, raising delicate issues of governmental privilege and inviting complex and time-consuming discovery disputes. *See, e.g., Vons Cos. v. United States*, 51 Fed. Cl. 1, 20-24 (2001) (resolving motion to compel discovery seeking documents "relating to the issuance or consideration" of a revenue ruling, noting that such information "will be relevant . . . only in very limited circumstances," and ordering an *in camera* review of documents to resolve the Government's claim of privilege). Ford, GM, and Saturn

[12] Even if this were a core proceeding, judicial economy would still be served by withdrawal since — given the complexity and importance of the issues raised — an appeal to the district court would be a given.

have already made similar requests in their refund suits, and have also requested all information about the tax treatment of signing bonuses dating back to the 1950s, as well as all documents reflecting the drafting and deliberation surrounding a (failed) proposal included in the Clinton Administration's 2000 and 2001 budgets that would have overruled the 1958 revenue ruling. *See* Exs. D and F. Indeed, counsel for Delphi already served the IRS with a Freedom of Information Act request concerning the background of the 2004 ruling. *See* Ex. G. Having a magistrate judge to oversee discovery and promptly resolve any disputes that may arise will help move this case along and serve the interests of judicial economy.

### 3. Withdrawal of the Reference Will Save the Parties From Cost and Delay

Withdrawal of the reference will also spare the parties unnecessary time and money. Again, because the bankruptcy court is constrained to issue only proposed findings of fact and conclusions of law, absent withdrawal the parties will have to fully litigate this case in the bankruptcy court and then bring that court's proposed rulings here, where they may be entirely re-litigated. "Withdrawal of the reference to the bankruptcy court would prevent the inevitable delay and cost to the parties of such a duplication." *Kohn v. Haymount Ltd. Partnership (In re International Benefits Group, Inc.)*, Civil Action No. 06-2363 (KSH), 2006 WL 2417297, at *3 (D.N.J. Aug. 21, 2006).

### 4. Withdrawal Will Not Affect Administration of the Bankruptcy

Withdrawal of this adversary proceeding will not adversely affect either the administration of this bankruptcy or the uniformity of bankruptcy administration generally. From the perspective of Delphi's bankruptcy — with assets of $13.7 billion — the $26 million at issue in this proceeding will not meaningfully affect either the payout to creditors or the ability of the Debtors to reorganize. And from the perspective of case administration, withdrawal is benign because this proceeding has virtually nothing to do with the bankruptcy beyond the coincidence that Delphi is bankrupt. This "limited withdrawal of the reference as to this single issue pose[s] no threat to the uniformity of the administration of this estate." *Burger Boys*, 94 F.3d at 762.

### 5. Forum Shopping Is Not an Issue Here

Last, forum shopping is not an issue here because this case will ultimately be decided by a district court. If this Court were to deny this motion, another judge in this district would end up deciding the same issues *de novo* after the bankruptcy court makes its proposed findings.

* * *

Every part of the permissive withdrawal inquiry points to granting this motion. Forcing this case to be litigated to the end in bankruptcy court, only to begin again in district court years from now — potentially on a distorted record, depending on the bankruptcy court's available energy to oversee discovery — would be pointless.

## CONCLUSION

The Court should grant the Government's motion to withdraw the reference, and assume jurisdiction over this adversary proceeding.

Dated: New York, New York
May 13, 2008

MICHAEL J. GARCIA
United States Attorney
Attorney for the United States of America

By: /s/ Matthew L. Schwartz
MATTHEW L. SCHWARTZ
JOSEPH N. CORDARO
Assistant United States Attorneys
Telephone: (212) 637-1945
Facsimile: (212) 637-2750
E-mail: matthew.schwartz@usdoj.gov