# In the United States Court of Federal Claims

No. 07-658T
(Filed: August 13, 2010)

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| **FORD MOTOR COMPANY,** | Deliberative Process Privilege; |
| | <u>In Camera</u> Review; Predecisional |
| Plaintiff, | Documents; Draft Press Releases; |
| | Factors for Determining Whether |
| v. | Deliberative Process Privilege is |
| | Overcome by Need. |
| **THE UNITED STATES,** | |
| | |
| Defendant. | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

<u>Thomas D. Johnston</u>, Shearman & Sterling, LLP, 801 Pennsylvania Avenue, NW, Washington, DC, for Plaintiff.

<u>Jason Bergmann</u>, U.S. Department of Justice, Tax Division, P.O. Box 26, Ben Franklin Station, Washington, DC, for Defendant.

---

**MEMORANDUM OPINION AND ORDER
BASED ON <u>IN CAMERA</u> REVIEW**

---

**WILLIAMS**, Judge

This matter comes before the Court on Plaintiff's motion to compel production of documents withheld under the deliberative process privilege. For the reasons stated below, the Court denies Plaintiff's motion.

### **Background**[1]

In this action, Ford Motor Company ("Ford") seeks a refund of $44,292,652 in taxes paid in 1996 and 1999, pursuant to the Federal Insurance Contributions Act ("FICA"), which imposes

---

[1] This background is derived from the Complaint, the parties' motion papers and exhibits.

1

an excise tax on wages. 26 U.S.C. §§ 3101 et seq.[2]  The Internal Revenue Code defines wages for FICA purposes as "all remuneration for employment," and "employment" as "any service . . . performed . . . by an employee for the person employing him . . . ." §§ 3121(a) and (b).

The taxes at issue were imposed on bonuses Ford paid its employees to induce them to ratify collective bargaining agreements. In April of 2000 and 2001, Ford filed refund claims for these FICA taxes arguing that because the bonuses had no relationship to the performance of services, they did not constitute wages within the meaning of FICA. Ford relied upon Revenue Ruling 58-145, which provided that signing bonuses paid to baseball players were not wages for income tax withholding purposes because they were neither predicated on the performance of services nor contingent on continuing employment.

On May 14, 2001, Judith M. Picken, the IRS' Tax Exempt and Government Entity ("TEGE") Area Counsel for the Great Lakes/Gulf Coast Area, issued a memorandum providing advice regarding Ford's refund claim to the Small Business/Self Employed ("SBSE") Area Manager for Area 5, Detroit. Def.'s Resp. to Pl.'s Mot. to Compel ("Def.'s Resp.") Ex. D-175-79, May 1, 2009.  In the memo, Ms. Picken addressed Revenue Ruling 58-145 as follows:

> The contract that Ford and its unionized employees entered into obligated Ford to pay the bonuses to those employees who were on its rolls on the effective date of the contract. Since Ford'[s] employees were required to have reported for work on or before that date in order to receive the bonus, the bonuses paid by Ford clearly did not meet the narrow conditions required under Rev. Rul. 58-145 to avoid employment taxation. Since the employees were required to be on the employment rolls to receive the bonus, Ford's bonus plan is more like the plan described in Rev. Rul. 69-424.

Def.'s Resp. Ex. D-177 to 178.  In the referenced Revenue Ruling 69-424, the IRS determined that amounts paid by a minor league baseball club to a college for tuition, books, and fees on behalf of one of its players pursuant to a contract between the player and the club were wages subject to employment taxes because the payments were contingent upon the baseball player reporting to spring training.[3]

Ford subsequently submitted additional information concerning the bonuses to the IRS, which the IRS characterized as follows:

---

[2] Pending resolution of the instant case, this Court stayed proceedings in a related suit, No. 09-368T, in which Ford seeks refund of $41,539,094 in FICA taxes paid in 2003. FICA taxes consist of Social Security and Medicare tax and are imposed on both the employer and employee.

[3] Some 15 years earlier in 1986, Revenue Ruling 69-424 was rendered obsolete by section 123(a) of the Tax Reform Act of 1986, which amended section 117 of the Code, to revise the tax treatment of college scholarships and grants. Pub. L. No. 99-514, § 123, 100 Stat. 2085, 2112 (1986).

> Ford provided that it was concerned that its Union employees might not ratify the 1996 collective bargaining agreement despite a generous outcome to the bargaining. It wanted to provide an additional benefit to insure ratification. The purpose for the bonus was to induce the employees to ratify the agreement. It was not intended to compensate the employees for services they performed.
>
> . . .
>
> Ford alleged that the payment of the bonus was not contingent on the employee performing any services. An employee who joined Ford's employment ranks on the day before the effective date of the agreement or left Ford's employment ranks the day after the effective date of the agreement would still be entitled to receive the bonus. The employee would have to have been on Ford's employment roles for one day to get a bonus.
>
> Ford alleged that had the employees not ratified the agreement, they likely would have ceased being Ford's employees.
>
> UAW newsletters described the payments as "first year up-front payment."

Def.'s Resp. Ex. D-182.

> The IRS concluded that:
>
> The additional facts provided by Ford do not change our opinion that the payments were wages for federal employment tax purposes. As we stated in our May 14, 2001 memorandum, Ford's reliance on Rev. Rul. 58-145, 1958-1 C.B. 360, is misplaced. The ruling might allow the exclusion of a bonus from wages if the bonus is paid solely in consideration for signing the contract. Because the Ford employees were required to report to work to receive the bonuses, the ruling does not apply. The bonuses that Ford paid were wages.

Id.

On July 16, 2002, the IRS issued its proposed disallowance of Ford's refund claims, articulating the following rationale:

> Under the provisions of IRC 3121(a), wages subject to employment taxes generally includes all remuneration for employment.
>
> The taxpayer cites Revenue Ruling 58-145, 1958-1 C.B. 360, for support of its position that the signing bonuses it paid were not considered wages. In the ruling, a baseball team paid a signing bonus to a baseball player for signing his first contract. The ruling presented two types of signing bonuses. With the first type of bonus, the contract provisions did not require the performance of subsequent services. The Service ruled that this type of signing bonus was not remuneration for services and was not "wages" subject to employment taxes. This ruling only pertained to income tax withholding treatment, but the definitions of wages for

3

FICA and FUTA taxes are the same as those for income tax withholding. With the second type of bonus, it was paid to a baseball player conditioned on continued employment of the player with the team. The Service ruled that this bonus was subject to the employment taxes, and constituted wages.

The Service revisited the signing bonus issue in Revenue Ruling 69-424, 1969 C.B. 15. In that ruling, the Service held that the amounts paid to a college on behalf of a professional ball player under a "College Scholarship Plan" were wages subject to income tax withholding, FICA taxes, and FUTA taxes. Under this College Scholarship Plan, the player agreed to play baseball for three months for a specified monthly remuneration paid directly to the player's college. The baseball team was relieved of its obligation under the Plan if the player failed to report for spring training at the direction of the club. The Service concluded that since payment of the amount was contingent on the employee reporting for work, the bonus was not solely in consideration for signing a contract.

The contact that Ford and its union employees entered into, obligated Ford to pay the bonuses to those employees who were on its rolls on the effective date of the contract. Since Ford'[s] employees were required to have reported for work on or before that date in order to receive this bonus, the bonuses paid by Ford did not meet the narrow conditions required under Revenue Ruling 58-145 to avoid employment taxation. Since the employees were required to be on the employment rolls to receive the bonus, Ford's bonus plan is more like the plan described in Revenue Ruling 69-424.

Ford also cites Revenue Ruling 74-108 for the purpose of explaining Revenue Ruling 58-145. In Revenue Ruling 74-108, a soccer club paid fees to several nonresident alien soccer players upon entering into sign-on agreements. The agreements were executed outside of the United States. The agreement did not commit the player to play for the club. It placed the player on the club's reserve list. By being on the reserve list, the player could not be recruited by another club. The club paid the fee to induce the player to enter into a player contract (a separate agreement from the sign-on agreement). The ruling concluded that the payments were subject to withholding for payments to nonresident aliens for the part of the payments that constituted compensation for the player's promise not to compete with the club in the United States.

The reasoning behind this ruling was explained in GCM 335016 (August 31, 1972) and GCM 35396 (July 11, 1973). In GCM 35016, the Service attempted to reconcile its initial conclusion that the payments were compensation for the signing of the agreement outside of the United States with Revenue Ruling 58-145, by stating that the bonus in Revenue Ruling 58-145 was not wages and not "remuneration for services performed by an employee for his employer." This is the definition of wages as described in IRC 3401(a). In GCM 35396, the Counsel rejected the position that the sign on fees [were] compensation for services. The GCM concluded that the payments were compensation for the promise not to compete with the club and therefore subject to withholding. Ford concluded that

4

under the reasoning of GCM 35396, a signing bonus was not wages if it was paid without any conditions of continued employment even if the recipient was an employee when he received the payment.

Both Revenue Ruling 58-145 and 74-108 concluded that the sign-in bonuses were not compensation for services. The recipients of the payments in each ruling performed no services for the employer. The soccer player in Revenue Ruling 74-108 gave up the right to play with another team. The baseball player in Revenue Ruling 58-145 was not obligated to do anything. Prior employment and continued employment were irrelevant to the rulings' conclusions.

In addition, the fact that almost all of the bonuses were paid to existing employees meant that Ford would find it difficult to show that the bonuses were not paid as compensation for the employees' past or future services. The bonuses appear to be substitutes for either forgone past pay increases or a lower pay raise in the current agreement. A substitute for taxable wages constitutes taxable wages. The bonus was compensation for services, and was not solely for ratifying the union agreement.

Since the receipt of the bonuses was contingent on the employee being on Ford's employment rolls and since the employees had provided past and future services for Ford, the bonuses were wages subject to employment taxes.

Def.'s Resp. Ex. D-207 to 209.

On December 13, 2004, while Ford was pursuing its administrative refund claims, the IRS published Revenue Ruling 2004-109, revoking the 1958 ruling which had been in effect for over 45 years. This new revenue ruling also revoked Revenue Ruling 74-108. In the 2004 ruling, the IRS determined that signing bonuses paid to baseball players constituted wages subject to FICA. The IRS stated:

[The 1958 ruling] erred in its analysis by failing to apply the Code and regulations appropriately to the question of whether the bonus was wages in each of the four questions presented. Specifically, it failed to apply the correct definition of wages and to consider whether the bonus was paid in connection with establishing the employer-employee relationship.

Rev. Rul. 2004-109.

The IRS also expressly addressed Ford's situation and found that a bonus paid to an employee for ratifying a collective bargaining agreement constituted wages. In Revenue Ruling 2004-109, the IRS noted that "[e]mployment encompasses the establishment, maintenance, furtherance, alteration, or cancellation of the employer-employee relationship or any of the terms and conditions thereof." Id. The IRS further stated:

[T]he employees receive the ratification bonus payments as part of a bargain that establishes the terms and conditions of the employment relationship with all of the employees covered by the [collective bargaining agreement]. The employees do

5

> not provide clear, separate, and adequate consideration for the employer's payments that is not dependent upon the employer-employee relationship and its component terms and conditions. The payments are part of the compensation the employer pays as remuneration for employment. Thus, the ratification bonuses are wages regardless of the fact that they are uniform in amount, do not vary based on seniority or position or any other factor, and are not explicitly contingent on the performance of services.

Id.

Under 26 U.S.C. § 7805(b), all revenue rulings apply retroactively unless they expressly state otherwise. By its terms, Revenue Ruling 2004-109 did state otherwise -- it applied prospectively to sign-on bonuses paid in connection with an employee's initial employment entered into after January 12, 2005. Specifically, Revenue Ruling 2004-109 stated:

> [T]he Service will not apply the position adopted in this ruling to any signing bonus, sign-on fee, or similar amount paid to an employee in connection with the employee's initial employment with the employer pursuant to a sign-on agreement or other contract entered into before January 12, 2005, provided the amount is paid under facts and circumstances that are substantially the same as in Rev. Rul. 58-145 or Rev. Rul. 74-108.

Rev. Rul. 2004-109. Because Revenue Ruling 2004-109 did not extend such prospective application to other bonuses, including ratification bonuses, it applied retroactively to those bonuses. 26 U.S.C. § 7805(b).

On September 29, 2005, the IRS issued final disallowances for both claims.

**The Discovery Dispute**

Ford served requests for production of documents relating to the development of both Revenue Rulings 58-145 and 2004-109. The Government sought a protective order, arguing that these documents were not relevant, or alternatively, that their production would be burdensome. Ford, in turn, filed a motion to compel. This Court ordered the Government to produce the requested documents, subject to any privilege claims. Ford Motor Co. v. United States, 84 Fed. Cl. 168, 173 (2008). Invoking the deliberative process privilege, the Government withheld 556 documents, either partially or in their entirety and described the documents in 26 privilege logs and five declarations.

Ford filed a second motion to compel -- the motion at issue here -- seeking documents Defendant withheld under the deliberative process privilege. Ford seeks what it characterizes as "documents that form the administrative record for Rev. Rul. 2004-109," claiming that such documents are relevant to whether this revenue ruling is entitled to any deference and whether retroactive application to Ford, but not similarly situated taxpayers, was an abuse of discretion.

6

Following arguments on the motion, the Court ordered the Government to file a representative sampling of the documents for in camera review, and Defendant submitted a representative sampling -- three binders -- determined by a cooperative effort between both parties' counsel.

On January 11, 2010, the Government advised the Court that it had produced seven documents to Ford because the District Court for Eastern District of Michigan ordered their production in a similar case. Def.'s Notice of Add'l Authority, Jan. 11, 2010.[4]

## Discussion

### The Deliberative Process Privilege

The deliberative process privilege, a subcategory of the executive privilege, protects intra-governmental pre-decisional documents "reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions are formulated." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975) (internal quotations omitted); Jade Trading, LLC v. United States, 65 Fed. Cl. 487, 493 (2005). The deliberative process privilege was first articulated and adopted by the Court of Claims in Kaiser Aluminum & Chemical Corporation v. United States, 141 Ct. Cl. 38 (1958); see CACI Field Servs., Inc. v. United States, 12 Cl. Ct. 680, 687 n.7 (1987). The Kaiser court characterized this privilege as an evidentiary privilege and recognized that "[t]he power must lie in courts to determine executive privilege in litigation." 141 Ct. Cl. at 50. This privilege subsequently has been widely recognized in Federal courts. See CACI, 12 Cl. Ct. at 686 n.7 (citing Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 40 F.R.D. 318, 324 (D.D.C. 1966), aff'd, 384 F.2d 979).

For a document to fall within the deliberative category of the executive privilege, it must be both pre-decisional and deliberative. Jade Trading, 65 Fed. Cl. at 493 (citing Vons Cos. v. United States, 51 Fed. Cl. 1, 22 (2001)). To qualify as pre-decisional, the information must address matters "'antecedent to the adoption of agency policy.'" Walsky Constr. Co. v. United States, 20 Cl. Ct. 317, 320 (1990) (quoting Jordan v. Dep't of Justice, 591 F.2d 753, 774 (D.C. Cir. 1978)). Additionally, to be deliberative, a document must reflect "'the give-and-take of the consultative process,' rather than constituting a 'body of secret law.'" Vons, 51 Fed. Cl. at 22 (quoting Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866-67 (D.C. Cir. 1980)).

The executive privilege is a qualified one, and can be overcome upon a showing of evidentiary need weighed against the harm that may result from disclosure. Marriott Int'l Resorts v. United States, 437 F.3d 1302, 1307 (Fed. Cir. 2006) ("[A] showing of compelling need can overcome the qualified deliberative process privilege."); Kaiser, 141 Ct. Cl. at 50; CACI, 12 Cl. Ct. at 687 (citing Smith v. Fed. Trade Comm'n, 403 F. Supp. 1000, 1015-16 (D. Del. 1975); Fed. Trade Comm'n v. Bramman, 54 F.R.D. 364, 366-67 (W.D. Mo. 1972). There is no subject-matter waiver associated with the deliberative process privilege. As courts have

---

[4] The Government produced documents at pages numbered 10069, 10070-71, 10072-73, 10076, 10078-79, 10082-86 and 11273.

recognized, "'[t]he concept of subject-matter waiver is almost uniquely a function of the attorney-client relationship. There is no authority for applying the waiver rule to the deliberative process privilege.'" Blue Lake Forest Prods. v. United States, 75 Fed. Cl. 779, 791 n.21 (2007) (quoting Gen. Elec. Co. v. Johnson, No. 00-5855, 2006 U.S. Dist. LEXIS 64907, at *55-56 (D.D.C. Sept. 12, 2006)). Thus, the Government's release of a document waives the privilege only for the document specifically released, not for related materials. In re Sealed Case, 121 F.3d 729, 741 (D.C. Cir. 1997).

As required to invoke the deliberative process privilege, the Government provided declarations identifying privileged information and articulating the agency's reasons for requesting confidentiality on a document-by-document basis. Alpha I, L.P. v. United States, 83 Fed. Cl. 279, 289 (2008) (citing Walsky, 20 Cl. Ct. at 320).[5]

**Category 1 Documents**

Ford seeks to compel production of documents relating to the development of Rev. Rul. 2004-109 which either:

> (i) discuss or otherwise reflect the administrative refund claims of Ford or the other automakers, and thus are relevant in determining whether Rev. Rul. 2004-109 was targeted at, and intended to resolve, those claims; or (ii) relate to the effective dates of Rev. Rul. 2004-109, i.e., that discuss, consider, articulate, justify, criticize, or explain the decision to apply that ruling prospectively to some taxpayers and retroactively to others, or that contain material considered or relied upon in connection with that decision.

Pl.'s Mot. to Compel 20-21. Ford refers to documents meeting the foregoing criteria as "Category 1" documents. Based upon the in camera review as well as descriptions in the privilege logs and declarations, the Court finds these documents to be subject to the deliberative process privilege – a matter Ford does not dispute. Instead, Ford argues that its evidentiary need for these deliberative documents is sufficient to overcome the privilege.

The deliberative process privilege is not absolute. Rather, the privilege is qualified, and can be overcome upon a showing of evidentiary need that outweighs the harms that may result from disclosure. Kaiser, 141 Ct. Cl. at 50. "[T]he party seeking the information must make a strong showing of need in order to breach the privilege." Zenith Radio Corp. v. United States,

---

[5] Margo L. Stevens, the Deputy Associate Chief Counsel for Legislation & Privacy, Procedure and Administration, in the IRS' Office of Chief Counsel, provided three declarations asserting the privilege for the IRS. Pl.'s Mot. to Compel, Exs. 1, 3, 4. John A. DiCicco, the Deputy Assistant Attorney General for Civil Trial Matters at the United States Department of Justice, Tax Division, provided one declaration asserting the privilege for DOJ. Pl.'s Mot. to Compel Ex. 2. W. Thomas Reeder, the Benefits Tax Counsel in the Office of Tax policy at the United States Treasury Department, provided one declaration asserting the privilege for the Treasury Department. Pl.'s Mot. to Compel, Ex. 5.

764 F.2d 1577, 1580 (Fed. Cir. 1985); see also Marriott, 437 F.3d at 1307 ("[A] showing of compelling need can overcome the qualified deliberative process privilege.").

Courts frequently consider the following five factors when assessing whether a plaintiff's need outweighs the harm of disclosure to the government:

1) the relevance of the evidence sought to be protected;
2) the availability of other evidence;
3) the 'seriousness' of the litigation and the issues involved;
4) the role of the government in the litigation; and
5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

See, e.g., Dairyland Power Co-op. v. United States, 77 Fed. Cl. 330, 338 (2007); In re Sealed Case, 121 F.3d at 737-38; Fed. Trade Comm'n v. Warner Communications, Inc., 742 F.2d 1156, 1161 (9th Cir. 1984); Tafas v. Dudas, 530 F. Supp. 2d 786, 801 (E.D. Va. 2008).

In conducting this balancing test, the Court has the option of reviewing the documents in camera. Pac. Gas & Elec. Co. v. United States, 71 Fed. Cl. 205, 207-08 (2006) ("'[I]n camera review of the documents is a relatively costless and eminently worthwhile method to insure that the balance between petitioners' claims of irrelevance and privilege and plaintiffs' asserted need for the documents is correctly struck.'" (quoting Kerr v. U.S. Dist. Court for the N. Dist. of California, 426 U.S. 394, 405 (1976))); see also In re Sealed Case, 121 F.3d at 757; Wright & Graham, Federal Practice and Procedure § 5690 ("It will usually be impossible to determine the relevance and importance of the evidence without an in camera inspection of the information claimed to be privileged.").

**Documents Relating to the Deference to Be Afforded Rev. Rul. 2004-109**

Ford asserts that it needs deliberative documents relating to its administrative refund claims to demonstrate that Revenue Ruling 2004-109 merits little or no deference from the Court. As Defendant recognizes:

> Whatever deference is given to Rev. Rul. 2004-109 will be determined under the Skidmore standard, on an evaluation of "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade . . . ."

Def.'s Resp. 28. (quoting Kerr-McGee Corp. v. United States, 77 Fed. Cl. 309, 315-16 (2007) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)); see Fed. Nat'l Mortgage Ass'n v. United States, 379 F.3d 1303, 1308 (Fed. Cir. 2004) (recognizing that where Chevron is inapplicable, an agency pronouncement may merit deference according to the Skidmore factors); St. Louis Bank for Coop. v. United States, 224 Ct. Cl. 289, 306 (1980) (evaluating deference to be accorded a revenue ruling under Skidmore).

Applying the Skidmore factors in this case does not require consideration of internal government deliberations. An evaluation of both "the thoroughness evident in [the Revenue

9

Ruling's] consideration" and "the validity of [the Revenue Ruling's] reasoning" ought to be apparent from the Revenue Ruling itself and relevant precedent. See Amoco Production Co. v. United States Dep't of Energy, No. 78-463, 1979 U.S. Dist. LEXIS 12103 at *5 (D. Del. May 29, 1979) (stating that "the first two elements of the Skidmore teaching can be ascertained by reference to the agency interpretations themselves and their articulated rationales"). As such, an assessment of the deference owed a revenue ruling based upon thoroughness of consideration and validity of reasoning is not measured by internal deliberations.

The third Skidmore factor, the Revenue Ruling's "consistency with earlier and later pronouncements" could require scrutiny of internal agency interpretations to the extent such earlier interpretations were not public or were inconsistent with the position the agency is now espousing in the litigation. Amoco, 1979 U.S. Dist. LEXIS 12103 at *5 (stating that the third Skidmore element "involves a comparison between the interpretations and actions of agency personnel at other times"). An agency should not be permitted to shield its earlier interpretation of law under the deliberative process privilege and then change its interpretation without disclosure or explanation. However, this potential misuse of the deliberative process privilege is not implicated here.

In Revenue Ruling 2004-109, the IRS determined that its prior pronouncement -- the 45-year old 1958 ruling -- was wrong and revoked that ruling as well as the 1974 Revenue Ruling which had applied it. This was all done publicly, and there is no suggestion that the IRS harbored a different interpretation of the term wages than it was espousing publicly.

Finally, under Skidmore, "all of those factors which give [an administrative interpretation like a revenue ruling] power to persuade" must be gleaned from the provisions of the ruling itself and the efficacy of its statutory interpretation -- not predecisional internal debate.

Plaintiff claims that it needs the deliberative documents to demonstrate that Revenue Ruling 2004-109 is entitled to little or no deference because the ruling was created to bolster the Government's position in litigation. This claimed need is "greatly minimized by an available alternative," which gives Ford "the evidence to make out [its] case without forcing a showdown on the claim of privilege." United States v. Reynolds, 345 U.S. 1, 11 (1953). The Government admits that it issued Revenue Ruling 2004-109 with knowledge of the automakers' claims. Defendant states:

> Here, defendant does not shirk from [the] link between the auto manufacturers' refund claims and Rev. Rul. 2004-109. The ruling project was commenced in response to a guidance request by LMSB [Large and Mid-Sized Business Division of IRS], which recognized that the project was "important" and "affect[ed]" at least the "three Detroit automakers."

Def.'s Resp. 29 (quoting Def.'s Resp. Ex. D-26). As the Government acknowledged, the overtures of an attorney representing an informal coalition of automakers

> made clear the auto manufacturers' keen interest in the outcome of the project. (D-67-77.) Thus, the drafters of the ruling, as well as their superiors, were well

> aware that the "[a]utoworkers filed claims for refund of FICA taxes" concerning "bonuses paid in connection with a collective bargaining agreement." (D-79.)

Def.'s Resp. 29; see also Def. Resp. 9-10 (admitting that documents in the public record indicate that the IRS' Large and Mid-Sized Business division instigated the revenue ruling knowing the automakers had already filed refund claims for FICA taxes on bonuses).

Given that the timing and context of the issuance of the Revenue Ruling are undisputed matters of public record, the determination as to whether the Revenue Ruling deserves less deference because of its link to Ford's refund claim is a legal issue which can be resolved without resort to the Government's internal deliberations. As a general matter "[r]evenue rulings merely represent the position of the United States and do not bind this court. Nonetheless, 'such memoranda may be relevant in a refund suit as indicating the IRS' interpretation of its own regulations and procedures.'" Western Co. of N. Am. v. United States, 323 F.3d 1024, 1032 (Fed. Cir. 2003) (quoting Int'l Bus. Mach. Corp. v. United States, 38 Fed. Cl. 661, 675 (1997) and citing Vons, 51 Fed. Cl. at 8, 11, 12). As Plaintiff points out, the Federal Circuit, in weighing the deference to be afforded to a revenue ruling, has considered the timing and context surrounding issuance of a ruling, stating

> [t]his [revenue] ruling was issued while AMP's refund claims were pending with the Internal Revenue Service (I.R.S.). A revenue ruling issued at a time when the I.R.S. is preparing to litigate is often self-serving and not generally entitled to deference by the courts.

AMP Inc. v. United States, 185 F.3d 1333, 1338-39 (Fed. Cir. 1999) (citing Tandy Corp. v. Commissioner, 92 T.C. 1165, 1170 (1989)). The extent to which AMP applies under the circumstances here is a legal determination to be made by the Court. As such, Ford has not articulated a sufficient need for deliberative documents to demonstrate what deference should be afforded to Revenue Ruling 2004-109.

**Documents Relating to the Retroactive Application of Rev. Rul. 2004-109**

Ford also claims a need for deliberative documents to show that the Government abused its discretion in applying Revenue Ruling 2004-109 retroactively to Ford but prospectively to taxpayers signing initial contracts because there is no basis for differing treatment.

The Commissioner's decision to apply a ruling retroactively to one taxpayer but not another is reviewed under an abuse-of-discretion standard. See Dixon v. United States, 381 U.S. 68, 75-76 (1965); United States v. Kaiser, 363 U.S. 299, 308 (1960) ("[The] Commissioner cannot tax one and not tax another without some rational basis for the difference.").

Courts have recognized that the Commissioner would abuse his discretion in applying a regulation retroactively if such retroactive application (1) would be "unduly harsh," or cause "inordinate harm" to, a particular taxpayer; (2) would alter settled prior law or policy implicitly approved by Congress and justifiably relied upon by the taxpayer; or (3) would result in inequality of treatment between two similarly situated taxpayers. Redhouse v. Comm'r, 728 F.2d 1249, 1252 (9th Cir. 1984); CWT Farms, Inc. v. Comm'r, 755 F.2d 790, 802 (11th Cir. 1985); Automobile Club v. Comm'r, 353 U.S. 180, 184 (1957); Helvering v. R.J. Reynolds

Tobacco Co., 306 U.S. 110, 116-17 (1939); Oshkosh Truck Corp. v. United States, 123 F.3d 1477, 1481 (Fed. Cir. 1997) (finding that the "Secretary cannot justify his treatment of Oshkosh's truck sales as a proper exercise of his discretion" because Oshkosh's truck sales were indistinguishable from truck sales that the Secretary exempted from the adverse tax treatment); Baker v. United States, 748 F.2d 1465, 1467 (11th Cir. 1984) ("[R]etroactive decisions that result in inequality of treatment unexplained by any rational basis can indeed constitute an abuse of discretion."); Exch. Parts Co. v. United States, 150 Ct. Cl. 538, 543 (1960) (finding that a revenue ruling's "distinction . . . based solely upon whether the particular taxpayer had, or had not paid his taxes" was irrational); Connecticut Ry. & Lighting Co. v. United States, 135 Ct. Cl. 650, 654 (1956); Elkins v. Comm'r, 81 T.C. 669, 681 (1983); Long v. United States, 10 Cl. Ct. 46, 58 (1986).

Although the IRS has the statutory authority to apply revenue rulings retroactively, the IRS generally modifies or revokes revenue rulings prospectively to avoid causing hardship to taxpayers relying on those rulings. See 26 C.F.R. § 601.601(d)(2)(v)(c) (prescribing that new revenue rulings revoking or modifying old rulings "ordinarily . . . will not be applied retroactively to the extent that the new rulings have adverse tax consequences to taxpayers."). As one commentator has noted:

> The Service's position is that "[w]hen revenue rulings revoke or modify rulings previously published in the Bulletin, the authority of Section 7805(b) ordinarily is invoked to provide that the new rulings will not be applied retroactively to the extent that the new rulings have adverse tax consequences to taxpayers." [Rev. Proc. 89-14, § 7.01(3)]. This position merely states the applicable law, since retroactive application of a revenue ruling that changes a prior position of the Service as to particular taxpayers who have relied on the earlier ruling to their detriment may constitute an abuse of discretion. However, irrespective of the detrimental reliance of any taxpayer, a revenue ruling may be retroactively revoked or modified to correct a mistake of law.

Michael I. Saltzman, IRS Practice and Procedure ¶ 3.03 [2][b] (2010)

Here, the IRS justifies the retroactive application on the ground that the 1958 Revenue Ruling erred in its analysis in failing to apply the correct definition of wages. The Supreme Court has recognized that the Commissioner has the authority to revoke a ruling retroactively to correct a mistake of law. Automobile Club, 353 U.S. at 184. Whether or not the 1958 revenue ruling was a mistake of law is a legal question, which does not depend upon the IRS' internal application or interpretation of the term wages. Rather, the validity of the 2004 Revenue Ruling's revocation of the 1958 ruling can be determined based upon the public record. This is not a situation where the taxpayer needs to probe the IRS' internal deliberations over what should be the correct definition of the term wages. There is no suggestion that the IRS applied that term inconsistently between 1958 and 2004. Rather, the public record indicates that on at least three separate occasions the IRS reaffirmed the 1958 ruling, and interpreted it consistently. See Rev. Rul. 74-108; Rev. Rul. 71-532; I.R.S. GCM 35396 (July 11, 1973).

In addition to asserting Revenue Ruling 2004-109 was correcting error, the Government also justifies retroactive application of this revenue ruling to the automakers on the ground that

the 1958 ruling did not apply to the automakers in the first place, and Ford was not entitled to rely on this ruling. In the IRS' view, the automakers are different than the ballplayers because the automakers' employees ratifying the agreements were on the rolls of the company and there was an existing employment relationship. Whether this distinction is valid or not will not be informed by the internal deliberations of Government attorneys.

Ford argues that this Court must "look to the record relied upon by an agency to determine whether the agency considered all relevant factors and did not rely on irrelevant or inappropriate factors." Pl.'s Mot. to Compel 27 (citing Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 420 (1971)). However, Ford's reliance on the typical considerations governing administrative decisionmaking is misplaced here. Contrary to Ford's arguments, whether the 1958 ruling applied to the ratification bonus is not dependent upon an agency record which should reflect a consideration of all relevant factors. Dixon, 381 U.S. at 79; Oshkosh Truck, 123 F.3d at 1481; Mulholland v. United States, 16 Cl. Ct. 252, 264 (1989); Baker, 748 F.2d at 1467. Rather, it is a legal call which this Court can make without relying upon the agency's internal weighing and sifting of alternative legal arguments. In short, the internal deliberations that Ford characterizes as an "agency record" developed in connection with the Government's decision to apply Revenue Ruling 2004 retroactively to ratification bonuses does not inform this Court's consideration of the legality vel non of the retroactive application.

**Documents that Plaintiff Claims Are Not Pre-Decisional: Category 2 Documents**

**Documents Relating to the Revenue Ruling Created Before November 3, 2004**

In its motion to compel, Ford identified documents, characterized as Category 2 documents, that it claims are not pre-decisional because they are dated after Revenue Ruling 2004-109 was finalized -- which Ford asserts was "likely no later than June 16, 2004." Pl.'s Mot. to Compel 32, 35-36 n.41; Ex. 34. To qualify as pre-decisional, the information must address matters "antecedent to the adoption of agency policy." Walsky, 20 Cl. Ct. at 320 (quoting Jordan, 591 F.2d at 774). As the Supreme Court has explained:

> The quality of a particular agency decision will clearly be affected by the communications received by the decisionmaker on the subject of the decision prior to the time the decision is made. However, it is difficult to see how the quality of a decision will be affected by communications with respect to the decision occurring after the decision is finally reached; and therefore equally difficult to see how the quality of the decision will be affected by forced disclosure of such communications, as long as prior communications and the ingredients of the decisionmaking process are not disclosed.

Sears, Roebuck & Co., 421 U.S. at 151.

Revenue Ruling 2004-109 was released on November 23, 2004, and published on December 13, 2004. Ford contends that the "finalization and approval" of Revenue Ruling 2004-109 occurred no later than June 16, 2004, as "[t]his appears to be the latest point at which agreement was reached on the substance and application of Rev. Rul. 2004-109." Pl.'s Mot. to Compel 33 (citing a privilege log entry for an e-mail memorializing the discussion of a

"consensus recommendation for . . . a particular approach that should be taken in drafting" the revenue ruling). The Government argues that the revenue ruling was not final until November 3, 2004, at the earliest, when the final decision was reached and cleared for publication.

The record indicates that Revenue Ruling 2004-109 was subject to three separate approvals -- from the Office of the IRS Commissioner, the IRS Chief Counsel, and the Treasury Department. Two of the three decisionmakers -- the Commissioner of the IRS and IRS Chief Counsel -- cleared Revenue Ruling 2004-109 for publication by July 28, 2004. However, Treasury subsequently placed the release of the ruling "on hold for several months," along with other "piece[s] of guidance," and did not clear the ruling for publication until November 3, 2004. Def.'s Resp. Ex. D-100. Regardless of why Treasury held back the revenue ruling, the act of suspending its release demonstrates that the agency was not ready to adopt the ruling until November 2004. As such, contrary to Ford's argument, documents dated after June 16, 2004, and before November 3, 2004, qualify as predecisional. See, e.g., Sears, Roebuck & Co., 421 U.S. at 153 (noting that the privilege calls for "the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be") (internal citations omitted); ICM Registry, LLC v. Dep't of Commerce, 538 F. Supp. 2d 130, 132 (D.D.C. 2008).

### **Documents Relating to the Revenue Ruling Created After the Decision Date of November 3, 2004**

Revenue Ruling 2004-109 was finalized and cleared for publication on November 3, 2004. Although certain e-mails discussing the revenue ruling postdate November 3, 2004, the Government asserts that these documents were created in support of Revenue Ruling 2004-109 and are subject to the deliberative privilege process because they reveal the authors' respective views on the proposed guidance prior to its completion and publication.[6]

Because these e-mails recount government employees' views of the proposed ruling before it was adopted, they qualify as pre-decisional even though they were created after the decision date. As several courts have recognized, documents created after a decision which recount pre-decisional deliberations are covered by the privilege. Citizens for Responsibility and Ethics in Washington v. Dep't of Justice, 658 F. Supp. 2d 217, 233-34 (D.D.C. 2009) (citing North Dartmouth Properties, Inc. v. Dep't of Hous. & Urban Dev., 984 F. Supp. 65, 68 (D. Mass. 1997); Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec., No. 04-1625, 2006 U.S. Dist. LEXIS 94615, at *22-24 (D.D.C. Dec. 22, 2006). Because these documents contain government employees' deliberations on the proposed ruling prior to its adoption, they are privileged.

### **Documents Relating to the November 23, 2004 Press Release**

The Government has also invoked the deliberative process privilege for drafts of a press release issued on November 23, 2004, and related correspondence, arguing that a press release is a government decision. Ford counters that these documents should be produced because press

---

[6] These emails are contained in documents numbered 11102, 11505, 10952, 13106, 11658.

releases have no relation to a policy decision and drafts of such releases are not pre-decisional, relying on Mayer, Brown, Rowe & Maw LLP v. Internal Revenue Service, 537 F. Supp. 2d 128, 139 (D.D.C. 2008). Pl.'s Reply at 19.

However, Mayer Brown narrowly focused on the fact that the draft press releases at issue there did not implicate a policy decision. 537 F. Supp. at 139. The Court in Mayer Brown relied upon Wilderness Society v. Dep't of Interior, 344 F. Supp. 2d 1, 14 (D.D.C. 2004)), which did not address press releases in general, but segregated "factual information which [did] not bear on the policy formulation," and found that such factual information was not subject to the privilege.

In a decision more pertinent here, ICM Registry, LLC v. Dep't of Commerce, 538 F. Supp. 2d 130 (D.D.C. 2008), the district court held that e-mail discussions regarding how to present an agency decision to the public were covered by the deliberative process privilege. The district court reasoned:

> [D]eliberations regarding public relations policy are deliberations about policy, even if they involve "massaging" the agency's public image. See, e.g., Sierra Club v. United States DOI, 384 F. Supp. 2d 1, 22 (D.D.C. 2004) ("DOI asserts that this document 'shows the development of the Department's policy regarding how to present its positions on ANWR,' and, as a draft, is predecisional to the Department's final positions. The Court agrees."); Judicial Watch, Inc. v. Reno, 2001 WL 1902811 at *3, 2001 U.S. Dist. LEXIS 25318 (D.D.C. 2001) (deliberations regarding "how to handle press inquiries and other public relations issues" are covered by exemption (b) (5)). The opinions of Commerce employees on public relations policy contribute to a deliberative decision regarding such policy, and are thus protected by the (b) (5) exemption.

538 F. Supp. 2d. at 136.

Because the draft press releases and related correspondence are pre-decisional to the November 23, 2004 press release and reflect recommendations concerning policy, they are protected by the deliberative process privilege.

**Documents Relating to Other Decisions**

Three of the documents reviewed in camera are dated after the revenue ruling, but precede and relate to other governmental decisions.[7] The Government claims that these three documents are deliberative with respect to other matters before the agencies. One document concerns a suggested legislative proposal and "reflects the views of individual IRS attorneys regarding 'the need for, and benefit of, legislative change affecting this matter.'" Def.'s Resp. 39 (quoting a declaration asserting the privilege). The other two include "deliberations concerning Ford's December 21, 2005 request that the IRS reconsider the retroactive application of Rev. Rul. 2004-109." Id. To be protected, deliberative information must support a governmental

---

[7] The Government originally asserted the deliberative process privilege for 10 documents dated after the revenue ruling and press release, but produced seven of these documents, leaving three documents -- numbered 11296-97, TREAS 1, and TREAS 2-9 -- at issue.

decision -- the Government must "'pinpoint an agency decision or policy to which the document contributed.'"  Walsky, 20 Cl. Ct. at 320 (quoting Senate of Puerto Rico v. Dep't of Justice, 823 F.2d 574, 585 (D.C. Cir. 1987)).  Because not all deliberations ripen into final agency decisions or policies, documents generated in support of an anticipated decision may also be covered by the privilege.  Walsky, 20 Cl. Ct at 320-21 (citing Sears, Roebuck & Co., 421 U.S. at 153 n.18 (1975)).

Based upon its in camera review, the Court concludes that the three documents numbered 11296-97, TREAS 1 and TREAS 2-9, are pre-decisional and deliberative, and therefore privileged.

## Conclusion

Plaintiff's motion to compel production of documents withheld under the deliberative process privilege is **DENIED.**

                                              s/Mary Ellen Coster Williams
                                              **MARY ELLEN COSTER WILLIAMS**
                                              **Judge**